732 So.2d 968 (1998)
EMPLOYEES' BENEFIT ASSOCIATION
v.
Richard D. GRISSETT.
1961766.
Supreme Court of Alabama.
September 11, 1998.
*970 Janie Salmon Gilliland of Memory & Gilliland, L.L.C., Montgomery, for appellant.
Sam E. Loftin of Loftin, Herndon, Loftin & Miller, Phenix City, for appellee.
LYONS, Justice.
The defendant, Employees' Benefit Association ("EBA"), appeals from a judgment entered in favor of the plaintiff, Richard D. Grissett. We affirm conditionally.
Grissett is a truck driver who has been employed for 18 years by Consolidated Freightways, Inc. EBA is a corporation that was formed in 1942 to provide certain benefits for the employees of Consolidated Freightways, Freightliner, Inc., and their *971 subsidiaries. Membership in EBA is entirely voluntary. EBA provides the following benefits for each member: life insurance of $25,000, additional group accidental death and dismemberment insurance, a funeral benefit of $300, and disability benefits in the amount of $15 per day for a maximum of six months for nonoccupational illness and injuries not covered by workers' compensation laws. In addition, EBA provides life insurance of $2,000 to any retiring member who has the requisite years of service. EBA provides its life insurance and accidental death benefits through a group life insurance policy that it obtains from a separate company; however, EBA provides its disability benefits from its own funds, which are received from the dues of its members. Each member pays dues of $6.75 per week.
EBA is governed by a five-member board of trustees; all of the board members must be members of the association. Four trustees are elected by EBA's membership; the fifth is appointed by the elected trustees. The board sets the policies of the association and controls its funds, both investments and disbursements. The board also appoints a manager to conduct the association's business. At all times pertinent to this case, Charles Prehn was EBA's manager. At the time of trial, he had served in that capacity for 17 years. A full-time secretary and a part-time bookkeeper are EBA's only other employees. EBA's offices are located in Portland, Oregon.
Upon joining EBA, each new member is provided with a copy of the association's articles of incorporation, its bylaws, and an informational pamphlet. A new member must agree to abide by the terms of the bylaws, which specify the time frame for submitting claims, the method for notice, and the forms necessary for use by the members when requesting disability payments. Grissett joined EBA in 1990. He acknowledged that upon joining he had received a copy of the bylaws and that he had agreed to abide by their terms.
On December 5, 1992, Grissett suffered a cerebral aneurysm at his home in Pittsview. He underwent neurosurgery in Birmingham on December 7 and was hospitalized until December 15. He then went home to recuperate. Grissett testified that he continued to take pain medication for about two months and that his doctors prescribed antiseizure medication for him until April 1993. He was not allowed to drive while he was taking this medication. Although Grissett's doctors had estimated that he would be disabled for six months, he was released on April 23, 1993, to return to work. Because his illness was not related to his job, Grissett was eligible for the disability benefits provided by EBA.
In order to file a claim for disability benefits, an EBA member is required to submit the claim on a particular form within a certain time. The version of the bylaws that was in effect when Grissett was disabled stated:
"4. DISABILITY BENEFITS.... To receive disability benefits, a member must file with [EBA] a claim on EBA Form # 1. Should this Form # 1 not be available at the member's place of employment, they may be obtained by writing the EBA office. No claim will be considered until the form has been completely and correctly submitted....
"5. COMPUTATION OF BENEFITS. There shall be paid to each member who is determined to be disabled a disability benefit during the period of disability in the amount of Fifteen Dollars ($15.00) per day or One Hundred Five Dollars ($105.00) per week. The period with respect to which disability payments are to be made shall commence on the eighth day of disability and shall continue during the period of the disability or for the period hereinafter specified, whichever period first expires. The number of weeks for which the Weekly Benefit is payable shall in no event exceed 26 weeks for any one period of disability....
". . . .

*972 "7. REPORT OF ILLNESS OR INJURY.
"(a) Each disability of more than seven (7) days duration shall be immediately reported by sending a completed EBA Form # 1 to the Association office. Part 1 of the Form is to be completed by the member, Part 2 is to be completed by the member's supervisor, and Part 3 is to be completed by the attending doctor. If a member fails to complete and file a claim as herein provided at the time the disability first occurs, but shall file the claim for benefits later than 31 days after the start of the disability for which the claim is made, the member shall not be entitled to benefits prior to the time the claim is filed unless he shall present to the Association a reason, satisfactory to the Trustees, for the delay in filing the claim.
"If, after filing the first claim form (EBA Form # 1) it appears to the Association that the disability may continue, an additional claim form (EBA Supplemental Claim Form # 2) will be sent to the member with his first check. Form # 2 is to be completed by both the attending doctor and the member's supervisor and returned for each check to be issued. This need not be weekly, but should not exceed a four-week period. Incomplete or unsigned claim forms cannot be accepted."
(Emphasis added.)
Grissett testified that his employer did not have any claim forms, so his wife telephoned the EBA office and requested EBA Claim Form # 1. After the Grissetts received the form, he said, he had to mail it to his doctor in Birmingham and wait for the doctor to complete his portion of the form and return it and that his wife then had to take the form to his employer in Phenix City to have the employer's portion completed. Only then, Grissett said, could he complete his portion of the form and submit it to EBA. EBA received Grissett's initial claim form on January 11, 1993, which was 37 days after he had first become disabled. According to EBA's bylaws, if a member filed a claim later than 31 days after the start of his or her disability, no benefits would be paid for the period before the claim was filed, unless the trustees were satisfied with the reason for the delay. Even though Grissett's claim was late, however, EBA paid the claim in full the day after it was received. Grissett received a $345 check dated January 12, representing payment for 23 days of disability for the period December 14, 1992, through January 5, 1993.[1] With this payment, EBA enclosed its Form # 2 for supplemental claims.
EBA Form # 2 must be completed by the member's attending physician and by the employer. Grissett testified that he again went through the process of mailing the form to his physician and waiting for the physician to complete it and mail it back, then having his wife take the form to his employer, and finally submitting the form to EBA. EBA received Grissett's second claim on February 16, 1993. EBA also considered this form to be late because it was filed more than four weeks after Grissett had submitted his first claim. Nevertheless, EBA paid the second claim also, sending Grissett a $585 check dated February 16, representing payment for 39 days of disability for the period January 6 through February 13. With the check, EBA sent Grissett another Form # 2. EBA also included a letter containing reminders to its members about the procedure for filing their claims, including the following:
"How often you receive a check is up to you. We respond with a check each time we receive a claim form but it should not exceed 4 weeks."
Grissett testified that he thought the language in the reminder letter meant he *973 could get a check whenever he wanted it. He also testified that he did not interpret either the bylaws or the reminder letter to contain a requirement that claims be filed within exactly four weeks.
EBA received Grissett's third claim on April 5, 1993. This time, Prehn denied Grissett's claim because, he said, it was late and because Grissett had not heeded the reminder letter sent to him with his second check. On April 6, Prehn sent a letter to Grissett informing him that his claim had been denied because its submission "substantially exceed[ed] the time limit allowed in Item 7 page 16 of your By-Laws." Prehn's letter also stated: "If you would care to present your reason for delay to the Board of Trustees which is satisfactory to them we can at that time process your claim." Grissett then wrote Prehn a letter, in which he stated: "I see no requirement that form # 2, for continuing disability, be filed in 31 days. It looks to me that form # 2 can be filed whenever I want another check for disability." Prehn responded with a letter in which he emphasized the importance of an EBA member's following the rules for submitting claims. In a reply, Grissett argued that the "rules" did not state that the second claim form "must be in within 31 days." (Emphasis in Grissett's letter.) Grissett also pointed out to Prehn that he had had neurosurgery and was taking strong medication.
On May 10, Prehn sent Grissett a letter responding to certain of his questions. The letter then stated:
"We have 6,000 members to deal with and what you have is group insurance. If you don't want to follow the rules like you agreed to you should find another insurance company to meet your needs. In group insurance you need a high degree of conformity to keep the costs down.... The pay period from February 13th to March 26th is suspended unless you can convince the Board of Trustees to pay you."
With the letter, Prehn included a $165 check dated May 10, representing Grissett's disability benefits for the period March 26 through April 5. Prehn also enclosed another EBA Form # 2 for Grissett to complete, and he stated: "Get it back to us within four weeks or [the checks] will stop again."
Grissett again went through the process of having the claim form completed. His physician and his employer signed the form on May 25 and May 28, respectively. EBA received the form on June 18. Prehn's secretary wrote a note in the file stating that the form was received eight days late. That claim was not paid.
On June 13, Grissett wrote a letter to the board of trustees, requesting that it consider the payment of his third claim. He stated that, in his opinion, the language in the bylaws about the claims-filing process was ambiguous because it stated that a claim form "should" be filed within four weeks, rather than stating that it "must" be. Grissett then explained to the board the difficulty he had had in complying with the four-week deadline:
"I live in Cottonton, Al., and my doctor was in Birmingham, Al., 200 miles away. The medication I was taking after the surgery was strong and I was just not able to attend to my personal business affairs in a normal manner. By the time I got form # 2, sent it to Birmingham, got it back and got my employer to fill out his part and sent it to Mr. Prehn, more than 4 weeks had gone by. The mailing time for all this took 10 days or so. I didn't purposefully wait longer than 4 weeks to get it filed. It just took longer and I was not aware of the importance of filing the claim in 4 weeks."
Prehn submitted Grissett's claim to the secretary of EBA's board of trustees, who denied his appeal. Prehn explained at trial that he took this action because EBA policy called for the board's secretary to consider appeals that were filed between regularly scheduled meetings of the board. On June 22, Prehn notified Grissett that *974 the secretary had denied his appeal. On July 22, 1993, EBA's board of trustees considered Grissett's appeal and denied it. The board also amended EBA's bylaws during the July 1993 meeting to reflect that the time in which a member submits an EBA Form # 2 "must not exceed a four-week period."
During July and August, Grissett and Prehn exchanged additional letters regarding Grissett's appeal to the board and the disposition of his fourth and final claim. Grissett also cancelled his membership in EBA. Finally, on August 27, Prehn wrote the following letter to Grissett:
"Your first claim came in late but we paid it without comment. Your second claim form was also late, but we paid that with a warning. The third form came in late and it was denied. You were sent a partial payment from when the doctor signed it to the day we received it. Attached to that check was another Form # 2 along with a warning to get it back to us in four weeks or payments would stop again. We received your last form on June 18thlate again.
"When the Secretary of the Board of Trustees reviewed and declined payment on June 22nd it included your last late claim. When you then didn't understand that the Secretary of the Board of Trustees acts for the Board, I then submitted your claim to the full Board at their regular quarterly meeting that was held on July 22nd. As I stated in my letter of July 23rd, they reviewed your full file and discussed it before voting to sustain the Secretary's denial.
"If you don't understand this explanation please write again. I am happy to answer as long as you continue to have questions."
Grissett sued EBA, alleging breach of contract and bad-faith refusal to pay insurance claims. The case was tried to a jury. During the trial, the court denied Grissett's preverdict motion for a judgment as a matter of law ("JML")[2] on the contract claim. The court also denied EBA's preverdict motions for a JML on the contract claim and the bad-faith claim. The jury returned a verdict for Grissett, assessing compensatory damages at $880 and awarding punitive damages of $150,000. On February 13, 1997, the trial court entered a judgment in favor of Grissett for $150,880. On March 13, EBA moved for a JML, or, in the alternative, for a new trial or a remittitur. On April 17, the court held a hearing on EBA's postjudgment motion. That motion was denied on June 11 by operation of law pursuant to Rule 59.1, Ala. R. Civ. P.
EBA argues that the trial court erred in denying its preverdict and postverdict motions for a JML on Grissett's breach-of-contract and bad-faith claims. EBA also argues that the trial court erred in denying its motion for a new trial or remittitur because, it argues, the punitive damages award was excessive.

I. The Motions For JML
When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the non-movant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). For actions filed after June 11, 1987, the nonmovant must present substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. *975 Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).

A. Breach Of Contract
In order to establish that a breach of contract has occurred, a plaintiff must prove: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." Southern Medical Health Systems, Inc. v. Vaughn, 669 So.2d 98, 99 (Ala.1995) (citations omitted). EBA argues that Grissett did not prove all of the elements that would have established a breach of contract; therefore, it says, it was entitled to a JML on the breach-of-contract claim. Grissett insists that he did prove all of the elements, and he argues that the trial court erred only to the extent that it did not grant his motion for a JML on that claim.
As to the first element, it is clear that a valid contract existed. "The constitution, bylaws, and regulations of a voluntary association constitute a contract between the association's members which is binding upon each member so long as the bylaws, etc., remain in effect." Scott v. East Alabama Educ. Foundation, Inc., 417 So.2d 572, 573 (Ala.1982). Neither party argues that EBA and Grissett did not have a valid contract.
As to the second element, EBA argues that Grissett breached the contract by not adhering to the procedures in the bylaws regarding the timely submission of claim forms. Although Grissett repeatedly was unable to file the requisite forms within the times specified in the bylaws, the parties disputed the interpretation of the meaning of the provisions in the bylaws regarding the time frames established for submitting claims. If the terms of a contract are ambiguous in any way, the meaning of the contract presents a question of fact for the jury to resolve. McDonald v. U.S. Die Casting & Dev. Co., 585 So.2d 853 (Ala.1991). Because the interpretation of the contract presented a jury question, the question whether Grissett performed his contractual obligations also was a jury question.
As to the third element, Prehn himself conceded that EBA had not fulfilled its contractual obligations, at least as to the fourth claim. After reviewing that claim at trial, Prehn testified that EBA's failure to pay the last claim was a mistake and that EBA "probably should have gone back and paid it in the correct way and maybe sent another Form 2 to do it correctly."
As to the fourth element, Grissett testified that he did not receive $880 in disability benefits to which he thought he was entitled.[3] He also testified that he had depended on the disability benefits to pay bills while he was unable to work and that he was under a great deal of stress wondering if EBA would pay the benefits.
We conclude that the trial court properly submitted the breach-of-contract claim to the jury.

B. Bad Faith
In Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981), this *976 Court, in a 5-to-4 decision, recognized a new tort action for the bad-faith failure to pay an insurance claim. Liability was grounded on either (1) the defendant's failure to pay the claim, with no lawful basis for the refusal, coupled with the defendant's knowledge of the fact that it had no lawful basis or (2) the defendant's intentional failure to determine whether there was any lawful basis for such refusal. 405 So.2d at 7. In National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala.1982), the Court modified those standards and recognized the "normal" versus the "abnormal" bad-faith case. In "normal" cases, the plaintiff's contract claim had to be so strong that the plaintiff would be entitled to a preverdict JML; if a fact issue made a JML inappropriate, then the defendant was entitled to a JML on the plaintiff's bad-faith claim. 419 So.2d at 1362. Even so, a trial court's failure to enter a JML on the plaintiff's breach-of-contract claim is not fatal as long as the trial court correctly determines that the plaintiff has met the standard of proof required for a JML. Loyal American Life Ins. Co. v. Mattiace, 679 So.2d 229, 235 n. 2 (Ala.), cert. denied, 519 U.S. 949, 117 S.Ct. 361, 136 L.Ed.2d 252 (1996).
EBA points to the standard set out in National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982). That case set out these requirements for a plaintiff to prove a bad-faith failure to pay:
"(a) an insurance contract between the parties and a breach thereof by the defendant;
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."
417 So.2d at 183. Requirements (a) through (d) represent the "normal" case. Requirement (e) represents the "abnormal" case.
The rule in "abnormal" cases dispensed with the predicate of a preverdict JML for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation. Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So.2d 661 (Ala.1995); Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990).[4] A defendant's knowledge or reckless disregard of the fact that it had no legitimate or reasonable basis for denying a claim may be inferred and imputed to an insurer when it has shown a reckless indifference to facts or proof submitted by the insured. Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981).
So, a plaintiff has two methods by which to establish a bad-faith refusal to pay an insurance claim: he or she can prove the requirements necessary to establish a "normal" case, or, failing that, can prove that the insurer's failure to investigate at the time of the claim presentation procedure was intentionally or recklessly omissive. Moreover, in a "normal" case, the insurer cannot use ambiguity in the contract as a basis for claiming a debatable reason not to pay the claim. Otherwise, an insurer would have the incentive to write ambiguous polices in order to *977 create an absolute defense to a bad-faith claim. Blackburn, 667 So.2d at 669.
Applying these standards, EBA first urges that it is not an insurance company and, therefore, that the inquiry ends here. We disagree. The relationship between the parties, whereby Grissett paid dues into EBA's membership fund, from which disability claims were payable pursuant to a written agreement between the parties, provides ample indicia of an agreement to which the doctrine of bad faith is applicable. See Schoepflin v. Tender Loving Care Corp., 631 So.2d 909 (Ala.1993). The instant case is distinguishable from Peninsular Life Insurance Co. v. Blackmon, 476 So.2d 87 (Ala.1985), where benefits were payable out of general operating revenue under an oral supplemental temporary-disability plan without any standards for the evaluation of claims.
Grissett's claims fell into two categories. One claim, for $615, was based upon a contention that EBA wrongfully denied his third request for benefits by treating that request as having been filed too late, under EBA's interpretation of its contract language. A second claim, for $270see note 3was based on a contention that EBA erroneously denied his fourth request for benefits even though it was not late. EBA maintains that Grissett failed to prove a breach of contract and that, on the contrary, Grissett himself breached the contract by not adhering to the policies and procedures set forth in the bylaws. EBA also asserts that Grissett failed to present sufficient evidence to prove that EBA intentionally refused to pay his claim and to prove that EBA did not have a debatable reason for refusing to pay, as required under National Security Fire & Casualty Co. v. Bowen, 417 So.2d at 183.
With reference to the claim for $615, EBA says that after paying two claims that it considered untimely, it warned Grissett about the need for adherence to the time limits stated in the bylaws. The operative portion of the timeliness requirement as to supplemental claims is expressed as "should be filed" rather than as "must be filed." Grissett points out that after he had difficulties with EBA, the wording was changed from "should" to "must." However, "should" has been determined to be the equivalent to "it is your duty." Tidwell v. State, 40 Ala.App. 580, 581, 118 So.2d 292, 293 (1960). At most, couching the duty in terms of "should" creates an ambiguity. The structure of the deadlines written into the bylaws was the subject of disputed interpretations, Grissett describing them in correspondence as ambiguous. The absence of a debatable reason not to pay a claim cannot be grounded on the vagaries of construction of an ambiguity. Blackburn v. Fidelity & Deposit Co. of Maryland so holds. 667 So.2d at 669. The requirement imposed by National Savings Life Insurance Co. v. Duttonthat the plaintiff be entitled to a directed verdict on the breach-of-contract claimis limited to the "normal" case, and it does not apply when the contract of insurance has an ambiguity. 419 So.2d at 1362. As it regards the $615 claim, the contract at issue in this case has an ambiguity.
With reference to the claim for $270, Grissett elicited admissions that EBA should have paid that final claim. Because Grissett thus proved a breach of contract as to the claim submitted in the fourth EBA Form # 2 (on which the defendant admitted owing benefits of $15 per day for 18 days for a total of $270), he successfully proved the elements necessary for the first method of establishing a bad-faith refusal to pay an insurance claim (the "normal" case). Whether to accept the defendant's self-serving statement that it had made a "mistake" in failing to pay was a question for the jury.
Grissett also elicited from Prehn an admission that EBA had not investigated his claims and statements suggesting that EBA's review procedures lacked depth. Prehn's testimony included the following:

*978 "Q. Let me ask you this: Tell me everything you did, everything Employees' Benefit Association did to investigate, to look into any reasons he had for being late.
". . . .
"A. We didn't investigate, no.
"Q. You didn't do any investigation?
"A. No, sir, we didn't. No, sir.
"Q. You didn't look at it?
"A. No, sir.
"Q. You didn't write the doctor or call the doctor?
"A. No sir. Not with that many members, we can't do that every time. It's group insurance.
"Q. So you didn't investigate it whatsoever, true?
"A. No. I didn't investigate it, no."
Under the evidence, the jury also could have found that Grissett's appeals to the secretary and then to the board were not properly and fairly consideredthat any consideration they received was merely superficial.
We conclude that Grissett also proved the elements necessary for the second method of establishing a bad-faith refusal to pay an insurance claimhe presented evidence from which the jury could find that EBA recklessly or intentionally failed to properly investigate his claim or to subject the results of an investigation to a cognitive evaluation. The trial court properly submitted the bad-faith claim to the jury.
Before we discuss EBA's arguments regarding the award of punitive damages, we note that what was once thought to be a rarely applicable remedy, recovery for the tort of an insurer's bad-faith failure to pay a claim, appears now with great frequency.[5] The result in this present case should give no comfort to those who, almost 20 years ago, saw a narrow niche for the new tort. Concern over the present status of the remedy is expressed in Stephen D. Heninger and Nicholas W. Woodfield, "A Practitioner's Guide to Alabama's Tort of Bad Faith," Alabama Lawyer, September 1996. For a general analysis of current trends, see John H. Bauman, "Emotional Distress Damages and the Tort of Insurance Bad Faith," 46 Drake L.Rev. 717 (1998); Alan O. Sykes, "`Bad Faith' Breach of Contract by First-Party Insurers," 25 J. Legal Stud. 405 (1996); and Douglas R. Richmond, "An Overview of Insurance Bad Faith Law and Litigation," 25 Seton Hall L.Rev. 74 (1994).

II. The Motion For A New Trial Or Remittitur
We now must consider the defendant's arguments concerning the amount of punitive damages awarded. EBA argues that even if it was not entitled to a JML, it is entitled to a new trial or at least to a remittitur of the punitive damages award because, it insists, the punitive damages award was excessive.
EBA challenges the punitive damages award both on the basis of the "guide-posts" established by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("Gore I"), and on the basis of the factors this Court set out in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). In other words, EBA argues that the award exceeds any amount justified by the evidence and thus is a denial of due process. In reviewing a punitive damages award, this Court considers the "guide-posts" established in Gore I and the factors set out in Hammond and Green Oil that pertain to the question of excessiveness. BMW of North America, Inc. v. *979 Gore, 701 So.2d 507 (Ala.1997) (on remand from the United States Supreme Court) ("Gore II").

A. The Gore I Guideposts

We first analyze the punitive damages award pursuant to the guideposts established by the United States Supreme Court in Gore I.

1. The reprehensibility of EBA's conduct.
"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore I, 517 U.S. at 575, 116 S.Ct. 1589. Although the Supreme Court did not provide any definitive rule by which to measure reprehensibility, it acknowledged that trickery and deceit are more reprehensible than negligence and that affirmative conduct, such as a deliberate false representation, is more reprehensible than the misconduct encompassed by an innocent representation. Id.
This present case involves no false representations. Immediately upon receiving his third claim, EBA informed Grissett that it would be denied because it was late. When Grissett challenged the denial, EBA stood by its decision, based upon its interpretation of its bylaws. While EBA's conduct may have been dogmatic, Grissett presented no evidence that EBA acted with any malicious intent to injure him. Moreover, EBA apparently operates its disability fund with no profit motive. The degree of reprehensibility in this case is low.

2. The ratio of compensatory damages to punitive damages.
A second indicium of either reasonableness or excessiveness is the ratio between the punitive damages award and the actual harm to the plaintiff. Gore I, 517 U.S. at 580, 116 S.Ct. 1589. The guaranty of due process does not require that this Court apply a mathematical formula to determine whether a punitive damages award is excessive; therefore, a remittitur generally is not justified solely on the basis of a high ratio. The ratio between the compensatory and punitive damages awards must be reasonable; however, a higher ratio may be justified in cases in which the harm to the plaintiff is hard to detect or the monetary value of noneconomic harm is difficult to determine. Id. This Court has found constitutionally acceptable ratios ranging from 1:1 in Ford Motor Co. v. Sperau, 708 So.2d 111 (Ala.1997), to 121:1 in Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala. 1997).
The punitive award of $150,000 is 170 times the compensatory award of $880. That 170:1 ratio is unacceptable. We have in this case an employees' association, not operated for profit and providing nominal benefits for modest dues, being held to the standards of a business regulated by the insurance laws of this state. EBA clearly is not such a business.

3. Sanctions for comparable misconduct.
We know of no civil or criminal penalties that could have been imposed in this case.

Summary of the Gore I analysis:

Our analysis of the Gore I guideposts, particularly the low level of reprehensibility and the high ratio between punitive and compensatory damages, indicates that the punitive damages award was excessive.

B. The Hammond/Green Oil Factors

We now consider the factors enumerated by this Court in Hammond and Green Oil.

1. The punitive damages award and the actual or likely harm.
"`Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be *980 much greater.'" Green Oil, 539 So.2d at 223, quoting Aetna Life Insurance Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially).
EBA's denial of two of Grissett's disability claims caused him to lose the income upon which he testified he was depending during the period in which he could not work. Although the actual amount of the disability income Grissett would have received is relatively small, he testified that he worried about the status of his claims during the time when he was trying to recover from major surgery. However, the jury did not award Grissett compensatory damages other than in the amount of his claims.[6]
Furthermore, the evidence reflects that an EBA member in Grissett's circumstances had virtually no chance of complying with the claims procedure established by EBA's bylaws. The member could do nothing until he had received EBA Claim Form # 2 in the mail with his check for the previous claim. In Grissett's case, he then had to begin the process of getting the form completed by his physician and his employer during a time when he could not drive. He testified that he had to rely upon the mail to get the form to and from his physician in Birmingham and that he had to wait for his physician to have time to complete the form. Grissett's wife then had to take the form to his employer. Finally, Grissett could mail the form to Portland, but, he said, mail between Alabama and Oregon usually took four to five days. In the case of Grissett's fourth claim, he did not even receive the claim form until after the four-week period already had run.
We believe the evidence supports an award of more than token punitive damages; therefore, this factor weighs against a finding of excessiveness of the punitive damages award.

2. The reprehensibility of EBA's conduct.
Our assessment of the degree of the reprehensibility of the defendant's conduct is broader in a Hammond/Green Oil review than our assessment in a Gore I review. At this point, we consider "`[t]he duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover up" of that hazard, and the existence and frequency of similar past conduct.'" Green Oil, 539 So.2d at 223.
The reprehensibility of EBA's conduct lies in EBA's dogmatic adherence to rules and bylaws that are inartfully drafted and therefore unworkable. Prehn consistently testified that he denied Grissett's final two claims because Grissett "didn't follow the rules." Because EBA had so many members, Prehn said, it held its members to a "high degree of conformity" in order to keep its costs down. Prehn also relied upon the importance of a member's following the rules when he testified that EBA could not investigate a member's individual circumstances before deciding to deny a claim. Nevertheless, the evidence indicates that EBA's attempts to enforce its rules at Grissett's expense were merely clumsy and dogmatic, not malicious. There was no evidence at all to indicate that EBA tried to conceal its actions.
Although EBA's conduct supports an award of more than token punitive damages, it does not reflect the degree of reprehensibility, often marked by greed, that has been the basis of large punitive damages awards in the past. Therefore, this factor weighs in favor of a finding that the punitive damages award was excessive.

*981 3. EBA's profit from its misconduct.

If the defendant's wrongful conduct was profitable, then we consider whether the punitive damages award removes the profit and whether it exceeds the profit so that the defendant recognizes a loss. Green Oil, 539 So.2d at 223. There is no evidence that EBA recognized any profit from its failure to pay Grissett's claims. To the extent that EBA may have profited, it is clear that the punitive damages award not only removed any profit, but far exceeded it. Therefore, this factor weighs in favor of a finding of excessiveness.

4. EBA's financial position.
The record contains no specific evidence regarding EBA's financial position. During the hearing on its postjudgment motion, however, EBA's attorney stipulated that it would not be crippled financially if it had to pay the punitive damages award. Therefore, this factor weighs against a finding of excessiveness.

5. Costs of litigation.
We must also consider whether the punitive award sufficiently rewarded the plaintiffs counsel for assuming the risk of bringing the lawsuit and encouraged other plaintiffs to bring wrongdoers to trial. Green Oil, 539 So.2d at 223. Grissett's lawyer presented no evidence to indicate that costs in this matter were excessive. The case action summary does not reflect an excessive amount of pretrial activity and the case culminated in a two-day trial. Based upon the lack of evidence presented, therefore, we conclude that this factor weighs neither for nor against a finding of excessiveness.

6. Criminal sanctions.
No criminal sanctions have been imposed upon EBA; therefore, this factor is inapplicable.

7. Other civil actions.
The record does not suggest that any other civil actions have been filed against EBA. Therefore, this factor weighs against a finding of excessiveness.
Summary of the Hammond/Green Oil analysis:
After considering the seven Hammond/Green Oil factors, we conclude that one of the factors is inapplicable and that one is neutral as to the issue of excessiveness. Two of the factors weigh in favor of a finding of excessiveness: the degree of reprehensibility of EBA's conduct and the degree to which EBA profited. Three of the factors weigh against a finding of excessiveness: the relationship of the damages award to the harm done to Grissett or likely to be done to him, EBA's financial position, and the lack of any other civil actions against EBA.

C. Final Analysis Of The Punitive Damages Award
We now return to a final consideration of the excessiveness of the punitive damages award in light of Gore I. A punitive damages award of $15,000 would reduce the ratio of punitive damages to compensatory damages to 17:1. Based on the low degree of reprehensibility of EBA's conduct, coupled with Grissett's modest economic loss and the absence of any compensatory award for loss or harm other than the denied benefits, such as any award for pain and suffering, we conclude that a $15,000 punitive damages award would be sufficient to punish EBA and to deter it from further conduct similar to that evidenced in this case, without compromising its due process rights.

III. Conclusion
The judgment is affirmed on the condition that Grissett file with this Court within 21 days a remittitur of punitive damages to the sum of $15,000; otherwise, the judgment will be reversed and the cause remanded for a new trial.
*982 AFFIRMED CONDITIONALLY.[*]
HOOPER, C.J., and SHORES and HOUSTON, JJ., concur.
MADDOX, J., concurs in the result.
KENNEDY, J., concurs in part and dissents in part.
SEE, J., concurs in part, concurs in the result in part, and dissents in part.
MADDOX, Justice (concurring in the result).
I concur in the result. I write specially only to state that in view of the United States Supreme Court's holding in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and its remand orders in Union Security Life Ins. Co. v. Crocker, 517 U.S. 1230, 116 S.Ct. 1872, 135 L.Ed.2d 169 (1996), and American Pioneer Life Ins. Co. v. Williamson, 517 U.S. 1231, 116 S.Ct. 1872, 135 L.Ed.2d 169 (1996), it may be time for this Court to look again at the history of the establishment of the tort of bad-faith failure to pay an insurance claim and to consider replacing it with a more appropriate remedy.
The tort of bad-faith failure to pay an insurance claim was created by this Court, in a 5-to-4 decision, in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981). The tort was subsequently modified in National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala. 1982).[7]
From the beginning, I have recognized that our law provided inadequate remedies in many cases involving an insurer's breach of an insurance contract, but I dissented in Chavers because I did not believe the remedy created in that case was the most appropriate remedy for the wrong alleged. Although I dissented in Chavers, I have always recognized the need for legislative or judicial action to fill the void in the case where an insurer wrongfully refuses to pay a legitimate claim under a policy. The proliferation of cases alleging bad-faith failure to pay and the size of jury verdicts suggest that remedial measures were in order, but we should ask whether the most appropriate remedy was to recognize the tort of bad faith and to allow juries unbridled discretion to award punitive damages. I did not think so.
I joined Chief Justice Torbert's dissenting opinion in Aetna Life Ins. Co. v. Lavoie, 470 So.2d 1060 (Ala.1984), in which he suggested an alternative remedy:
"The tort of bad faith breach of an insurance contract was judicially created to fill a remedial void. Had it not been for the lack of adequate contractual damages, the need for this tort in the insurance context (and it thus far has been restricted to insurance in Alabama) would not have arisen. Traditionally, contract damages for breach of an insurance policy were limited by the classic case of Hadley v. Baxendale, 9 Ex. 341, 156 Eng.Rep. 145 (1854), to the face value of the insurance policy plus the legal rate of interest. Consequential damages for personal injuries, inconvenience, annoyance, loss of job or business, or mental anguish and suffering were not recoverable ex contractu, such damages being viewed as unforeseeable and not within the contemplation of both parties at the time of contract formation. *983 This rule excluding consequential damages is still followed in non-insurance contexts in Alabama today. See, Jefferson County Burial Society v. Curry, 237 Ala. 548, 187 So. 723 (1939); Stead v. Blue Cross-Blue Shield of Alabama, 346 So.2d 1140 (Ala.1977). Of course, punitive damages are disallowed, as well.
"In severely limiting contractual damages to the face value of the policy plus the legal rate of interest, the law created an incentive for insurers to refuse payment of even legitimate claims. The insurers had nothing to lose, and everything to gain, by refusing payment of even meritorious claims. At most, the assessed damages would equal the limits of the policy plus the legal rate of interest (sometimes far below the actual market rate). Any tangible consequential economic [damage], such as loss of job or bankruptcy, and intangible [damage], such as emotional distress, were borne entirely by the insured, on the basis that certainly they were not within the contemplation of the bargain of the parties. Consequential losses were allowed to lie where they fell, even in the case of intentional breach of contract.
"If I were writing on a clean slate, yet enlightened by foreseeing the results of this Court's recognition of the tort of bad faith, I would be inclined to argue for an expansion of the [damages] rules in contract rather than creation of a new tort. There are several advantages to confining first-party insurance cases to the field of contract law, with an expansion of the damages remedy.
"Contractual duties are consensual, and even when implied they have the virtue of implication from the contract itself. There are well-established rules for determining a breach and its consequences. Contracts is perhaps the most concrete and predictable body of legal doctrine, whose application is unlikely to defeat any valid expectation interests of the parties; this is certainly important in the insurance context, where predictability, at least of the statistical variety, is necessary in calculating premiums. Finally, judicial control of the excesses of passionate juries is less problematic in contracts than it is in the realm of torts. In contracts, the important issues are more often legal than factual, and any modification of [damages] rules would not require the availability of punitive damages.
"In contrast to the virtues of contract law in general, and to a mere modification of contract [damages] rules in particular, the creation of any new tort is fraught with disadvantages, as our recent experience with the insurance-specific tort of bad faith demonstrates.
"The duties recognized in tort are non-consensual, imposed from without, either because of a special relationship between the parties or because of perceived public policy implications. Such duties are of necessity amorphous, becoming in application little more than matters of degree, best suited to resolution by a jury. Tort duties are difficult to judicially define or confine; although most courts are content with the enunciation of standards, such as `reasonable care,' in defining tort duties, wherever courts enunciate particular concrete rules, the process becomes endless, with attempts to cover each fact situation specifically as it arises, ultimately causing more confusion than clarity as the specific rules inevitably conflict.
"Determining whether the breach of a tort duty has occurred is almost as problematic and fluid as is the initial definition of the duty. Unlike contracts, the comparative advantage in making this determination lies with the jury, and not the judge. Because tort cases are so fact-intensive and the liability rules so amorphous, the results at trial are unpredictable and often inconsistent, an especially undesirable consequence in the insurance context. Finally, in tort the scope of liability is much broader than in contract, especially with respect *984 to intentional torts. Almost all damages proximately flowing from the cause are recoverable; and, of course, punitive damages are recoverable in the appropriate aggravating circumstances. This problem of excessive and even spurious [damages] awards could have been, and still can be, obviated by simply restricting the cause of action to contract and carefully expanding the contractual damages rules for non-commercial insurance contracts.
"The foundation for such a carefully crafted expansion has already been laid in Alabama law. As already noted in Stead, supra, consequential damages have been viewed unfavorably in Alabama in recent years in breach of insurance contract cases, due to the fact that they were `too remote, were not within the contemplation of the parties, and [the fact] that the breach of contract is not such as will naturally cause mental anguish.' Stead, supra, at 1143, citing Westesen v. Olathe State Bank, 78 Colo. 217, 240 P. 689 (1923)[(1925)].
"Yet, certain exceptions to this general rule have long been recognized in Alabama and around the country. As quoted in Southern [Ry.] Co. v. Rowe, 198 Ala. 353, 73 So. 634 (1915)[(1916)], and repeated in Stead, supra, at 1143, `... where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of the duty will necessarily or reasonably result in mental anguish or suffering, it is just that damages therefore be taken into consideration and awarded.'
"Certainly an insurance contract is not an ordinary commercial contract for profit in which mental distress damages are unforeseeable. The insured does not bargain for a profit; instead he bargains for compensation in time of catastrophe and for peace of mind. In this sense, an insurance contract is more akin to contracts of carriers and innkeepers, for which consequential damages have long been recognized due to the personal nature of the service. A particularly likely risk of breaching an insurance contract is resulting impoverishment or bankruptcy. Coupled with the fact that such breaches almost always coincide with emotional vulnerability (death, health problems, or destruction of a business or home), a very strong case can be made for awarding consequential damages for financial loss and even for emotional disturbance. See, Restatement (Second) of Contracts, § 353, comment a (1982). Insurers, in effect, sell freedom from care and worry, and should be held to foresee the consequential damages flowing from their breach. Several cases in other jurisdictions have flirted with this approach. See, Reichert v. General Ins. Co. of America, 68 Cal.2d 822, 849, 69 Cal. Rptr. 321, 337, 442 P.2d 377 (1968) (dissenting opinion); Miholevich v. Mid-West Mut. Auto. Ins. Co., 261 Mich. 495, 246 N.W. 202 (1933); see also, K. Harvey and T. Wiseman, First Party Bad Faith: Common Law Remedies and a Proposed Legislative Solution, 72 Ky. L.J. 141 (1983-84)."
470 So.2d at 1078-80. It seems to me that former Chief Justice Torbert, in his dissent in Aetna, pointed out many of the problems associated with awards of punitive damages in cases involving first-party insurance claims, problems the Supreme Court of the United States mentioned in BMW v. Gore, supra.
Given the requirements of BMW v. Gore, I suggest that it very well may be appropriate for this Court, or for the Legislature, to reexamine the tort of bad-faith failure to pay and to do so in light of what former Chief Justice Torbert said in his dissenting opinion in Aetna v. Lavoie 14 years ago.[8]
*985 KENNEDY, Justice (concurring in part and dissenting in part).
I concur in the holding that the trial court properly submitted the plaintiff's bad-faith and breach-of-contract claims to the jury. However, I dissent from that part of Justice Lyons's opinion holding that the jury's award of punitive damages should be reduced by 90%from $150,000 to $15,000.
SEE, Justice (concurring in part, concurring in the result in part, and dissenting in part).
I concur in Part I.A. of the main opinion regarding the breach of contract claim. See McDonald v. U.S. Die Casting & Dev. Co., 585 So.2d 853 (Ala.1991). I join Justice Maddox's opinion concurring in the result with respect to Part I.B. of the main opinion, regarding the bad-faith-failure-to-pay claim. See Aetna Life Ins. Co. v. Lavoie, 470 So.2d 1060, 1078 (Ala.1984) (Torbert, C.J., dissenting). I concur in that portion of Part II. of the main opinion holding that the punitive damages award is excessive.
I respectfully dissent, however, from that portion of Part II. of the main opinion holding that a $15,000 punitive award would be appropriate. If the defendant's conduct is reprehensible at all, then, as the main opinion recognizes, "[t]he degree of reprehensibility in this case is low." 732 So.2d at 979. Further, no combination of factors justifies an extraordinary punitive award. Nonetheless, the main opinion approves a 17:1 ratio of punitive damages to compensatory damages. 732 So.2d at 981. I would approve no more than a 3:1 ratio of punitive damages to compensatory damages, based on the rationale I set forth in Life Insurance Co. of Georgia v. Johnson, 701 So.2d 524, 535 (Ala.1997) (See, J., concurring in part and dissenting in part). Accord Union Sec. Life Ins. Co. v. Crocker, 709 So.2d 1118, 1125 (Ala.1997) (See, J., dissenting) (noting the arbitrary amounts of punitive awards approved by this Court since BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)), cert. denied, ___ U.S. ___, 118 S.Ct. 1515, 140 L.Ed.2d 668 (1998).
NOTES
[1] On his initial claim form, Grissett stated that his disability began on December 5, 1992; however, his doctor's portion of the form stated that Grissett's disability began on December 7. EBA treated the disability as beginning on December 7.
[2] Effective October 1, 1995, Rule 50, Ala. R. Civ. P., was amended, as a matter of form only, so as to rename "motions for directed verdict" and "motions for judgment notwithstanding the verdict" as "motions for judgment as a matter of law." Rather than continue to use the terminology of the former rule, which terminology sometimes is used in the briefs and the record in this proceeding, we have used in this opinion the terms used in the amended rule.
[3] Grissett testified that he was due a total of $880 in benefits, for 59 days of disability, that EBA refused to pay. We note, however, that the correct calculation of benefits for 59 days of disability at $15 per day would have been $885.
[4] We have come very far from Justice Jones's concurrence in Continental Assurance Co. v. Kountz, 461 So.2d 802, 810 (Ala.1984), where he expressed concern that indiscriminate references to recklessness might cause confusion that could lead to the imposition of liability for bad faith without proof of an intentional injury.
[5] Compare the reference to "rare and extreme cases" in Waldon v. Cotton States Mutual Insurance Co., 481 So.2d 340, 341 (Ala. 1985), with the observation in United Insurance Co. of America v. Cope, 630 So.2d 407, 412 (Ala.1993), that rarity of bad-faith claims has not been the experience.
[6] We will not parse the record for evidence of mental anguish in an attempt to reduce the ratio between compensatory and punitive damages when the jury has not awarded damages for such harm. Compare Life Ins. Co. of Georgia v. Smith, 719 So.2d 797 (Ala.1998) (holding that the Court will not parse the record for evidence of compensatory or nominal damage to justify an award of punitive damages only).
[*] Note from the reporter of decisions: On January 6, 1999, the Supreme Court issued the following order:

"This Court having been advised by the appellee, Richard D. Grissettt, on or about December 28, 1998, that he elects not to accept the remittitur,
"IT IS ORDERED that the judgment of the trial court is reversed and the cause is remanded for new trial pursuant to this Court's opinion of September 11, 1998."
[7] In Dutton, this Court set out the elements of the tort and stated that in the "normal case" a cause of action would not be judicially recognized if there was a fact issue concerning the plaintiff's contract claim.
[8] On several occasions I have suggested that there are attractive alternatives to the tort of bad-faith failure to pay, and I have even suggested in one opinion that the Legislature might consider providing an alternative remedy. See Loyal American Life Ins. Co. v. Mattiace, 679 So.2d 229 (Ala.1996) (Maddox, J., dissenting); Independent Fire Ins. Co. v. Lunsford, 621 So.2d 977 (Ala.1993) (Maddox, J., concurring in part; dissenting in part); Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala. 1987) (Maddox, J., concurring specially); and Continental Assurance Co. v. Kountz, 461 So.2d 802 (Ala.1984) (Maddox, J., dissenting).