YATES, Presiding Judge.
John V. Hobbs sued United Services Automobile Association (“USAA”)on November 3, 1999, alleging a breach of contract, fraud, bad-faith denial of an insurance claim, and the tort of outrage. Hobbs sought to recover both compensatory and punitive damages. USAA answered on December 6, 1999, denying the allegations contained in the complaint and affirmatively alleging that Hobbs had failed to cooperate and had misrepresented certain material facts during the course of its investigation of his claim.
The case proceeded to trial before a jury on October 31, 2001. At the close of Hobbs’s case, USAA moved the court for a preverdict judgment as a matter of law (“JML”)(formerly a motion for a directed verdict) as to the counts of the complaint alleging breach of contract, fraud, and bad-faith refusal to pay an insurance claim.[1] The trial court denied the preverdict JML as to the breach-of-contract and bad-faith counts and granted it as to the fraud count.
At the close of all the evidence, USAA renewed its motion for a JML as to the count alleging bad-faith refusal to pay an insurance claim; USAA did not renew its motion for a JML as to the breach-of-contract count, conceding that a jury question existed as to that count. The trial court denied the motion and submitted the case to the jury. On November 7, 2001, the jury returned a verdict in favor of Hobbs on the counts alleging breach of contract and bad-faith refusal to pay and awarded him $65,000 in compensatory damages and $15,000 in punitive damages. The trial court entered a judgment on the verdict on that same day. USAA moved the court for a postverdict JML or, in the alternative, for a new trial; that motion was denied by operation of law. USAA appeals.
Hobbs was a first sergeant in the United States Army and was stationed in Germany with his wife, Myong[2] and their two children. Hobbs’s mother became ill, and he requested that his foreign-service tour be terminated early. Hobbs’s request was granted and he was transferred to Fort Rucker in Enterprise. Hobbs testified that before he was transferred, he purchased a number of expensive antiques and collectibles as an investment for his children. Hobbs stated that those items were purchased in January and February 1998.
Hobbs testified that the Army coordinates and handles through its transportation office every aspect of a soldier’s move. He stated that the company chosen by the Army to move a soldier does a pre-move inspection and all of the packing and boxing of the soldier’s property. The property is packed in boxes that are sealed and numbered. The boxes are then packed into larger wooden crates, and larger items, such as furniture, are numbered and placed directly into the crates. The crates are then caulked and nailed shut. A numbered metal or plastic seal is placed on the crate and the crate is then banded with a large metal band. The metal bands must be cut with shears in order to remove them. Hobbs testified that the soldier is not allowed to participate in the packing process. Hobbs further stated that a representative of the moving company inventories on controlled documents all of the property.
The company chosen by the Army to pack and move Hobbs’s property from Germany to the United States was Vikto-ria Erbes G.m.b.H (“Erbes”). Inventory documents generated by Erbes indicate that it packed and inventoried Hobbs’s property on Friday, March 27, on Monday, March 30, and on Tuesday, March 31, *969 1998. Hobbs testified that he was present the entire time Erbes was packing his property. An inventory list generated by Erbes indicates that 493 boxes and/or large items were removed from Hobbs’s apartment. The inventory list indicates that box no. 286 contained “Austrian porcelain — crystal—150 CDS” and that box no. 372 contained “china — silverware— crystal.” The 493 boxes and/or large items were packed into 18 crates. Erbes generated an inventory document that contained the crate numbers with their corresponding seal numbers. Hobbs noted the following on this document: “Crates were nailed shut. Tops of crates appeared old and some were loose. I did not verify seals on each container as it is specified.”
Erbes also generated an inventory form entitled “High Risk Items Addendum to Inventory.” Listed on this document are a number of items owned by Hobbs the value of which is high, such as computer, stereo, and television equipment. Hobbs noted the following on the high risk addendum: “China, crystal, antique collections, and silverware not noted on all inventory items due to large quantity. I will note these on the back of the loss prevention work sheet.” Hobbs testified that he listed with specificity on the back of the loss-prevention worksheet certain pieces of expensive china, silver, and antique collectibles. The record contains a photocopy of the front of the loss prevention worksheet; however, it does not contain a copy of the reverse side of that document. Hobbs testified that he attempted to obtain a copy of the reverse side of the loss prevention worksheet from Erbes, but was unable to do so because the company had declared bankruptcy and was no longer in business. The high risk addendum and the loss-prevention worksheet were signed by both Hobbs and the Erbes representative.
Hobbs’s property and the inventory documents were shipped overseas and stored in a warehouse managed by Coleman America Moving Services (“Coleman”).[3] Eddie Baxter, the warehouse supervisor for overseas shipments for Coleman, testified that he inspected Hobbs’s shipment and that all of the crates were present and properly sealed and banded and that none of the tops of the crates were loose. Hobbs’s property was delivered to his residence by Coleman on June 10,1998.
Hobbs testified that when his property was off-loaded he noticed that some of it was damaged and that when the doors of the moving truck opened “stuff fell out.” He stated that he did not inspect the seals on the crates before the crates were opened. Hobbs testified that he checked his property off the inventory list provided by Coleman as it was off-loaded and discovered that box no. 286 and box no. 372 were missing. Martha Foerch, a Coleman employee who delivered Hobbs’s property, testified that she posted the inventory sheets and that Hobbs checked his property as it was off-loaded. Foerch confirmed that some of Hobbs’s property was damaged and that some property was missing; however, she stated that Hobbs never indicated to her that the missing property was valuable antiques and collectibles. Hobbs testified that he and a representative from Coleman completed a form entitled “Joint Statement of Loss at Delivery” indicating, among other things, that boxes nos. 286 and 372 were missing.
Hobbs requested a reweigh certificate of his shipment, which indicated that it weighed 289 pounds less upon arriving in *970 the United States as it did when it left Germany. Foerch stated that such a discrepancy in weight would indicate that some of the shipment was missing. She stated that generally when property is missing from shipments that originate in Germany, the property never gets “put on the inventory sheets and the Germans will keep it.” Foerch stated that the property is generally removed from the crates before they are sealed. Baxter testified that the weight discrepancy could be attributed to differing fuel levels in the tractor-trailers when they are weighed, or one tractor-trailer could be weighed with a person on it while the other tractor-trailer was not.
Hobbs submitted a claim of approximately $21,000 for his damaged property to the Army claims office at Fort Rucker. The Army paid Hobbs $13,312 to settle his claim. Larry Jackson, a claims examiner with the Army claims office, testified that he was notified of Hobbs’s shipment and went to inspect it. Jackson stated that Hobbs had suffered “a lot of damage” to his shipment. The office of the staff judge advocate notified Hobbs that it was awarding him less than the amount claimed because depreciation was subtracted from the replacement costs of certain destroyed items; because Hobbs was unable to substantiate the value of certain items; and because Hobbs was unable to substantiate that certain items represented as antiques were, in fact, antiques. Jackson testified that Hobbs represented certain items to be antiques that were later determined not to be antiques. Because Hobbs had an insurance policy with USAA, Jackson referred him to USAA regarding a claim for his lost or stolen property.
Hobbs had a USAA renter’s policy in effect at the time of the alleged loss; the items allegedly lost or stolen were covered by the policy. The policy provided personal-property coverage of $89,000 including replacement-cost coverage and increased coverage for silverware. The policy contains the following provisions:
“CONCEALMENT, MISREPRESENTATION OR FRAUD
“The entire policy is void if, whether before or after a loss, an insured:
“a. intentionally conceals or misrepresents any material fact or circumstance; or
“b. makes false statements or engages in fraudulent conduct relating to this insurance.
“DUTIES AFTER LOSS
“If there is an accident or incident that may be covered by this policy you must do the following:
“1. In the case of a loss by theft, vandalism, or malicious mischief, immediately notify the police or military authority, whichever has jurisdiction over the location where the loss occurred. Immediately notify the credit card or fund transfer card company in ease of loss under CREDIT CARD or FUND TRANSFER CARD coverage.
“2. Protect the property from further damage.
“3. Contact us as soon as possible and tell us as much as you can about the loss. Give us the price and date of purchase, actual cash value and a complete description of the artiele(s) involved.
“4. Submit a proof of loss when required by us.
“5. Send us receipts, appraisals or other proof of ownership or value. Tell us if there is a hen on the property, and who holds it. You must tell us if there is other insurance on the property.
*971 “6. If required by us, you must show us the property and answer our questions under oath about the loss or damage.
“7. You must tell us about the loss within 91 days after the loss is discovered. Unless you are reasonably prevented from doing this, your claims will not be accepted.”
Hobbs reported the alleged loss to USAA, and USAA began an investigation of Hobbs’s claim. Hobbs submitted a sworn statement of loss to USAA claiming $68,094 in lost or stolen property. Hobbs provided documentation to USAA in an attempt to substantiate his loss and gave a number of recorded statements to representatives of USAA, including one examination under oath. USAA had failed to pay Hobbs’s claim by November 1999 so he filed the action underlying this appeal. On December 3, 1999, USAA notified Hobbs by letter that it was denying his claim for the lost or stolen items. The letter stated, in part, as follows:
“USAA Insurance Company was in the process of concluding its investigation in this case at the time you chose to file suit against USAA. While your failure to cooperate with USAA has prejudiced its investigation in that you have not produced documents necessary to support your claim, USAA has determined that your claim for benefits should be denied.
“First, you have failed to produce sufficient evidence that the items alleged by you to have been taken during transit were, in fact, purchased by you during January and February 1998. Further, you have failed to produce any actual receipts or photographs of the items to prove their existence prior to your move back to the United States from Germany.
“Second, USAA is of the opinion that during the course of our investigation into this theft loss, you made material misrepresentations to us and suppressed material facts which have violated the concealment and fraud provisions of the policy. ■ For that reason, the policy would be void based on those material misrepresentations.”
The letter was signed by Barbara Slawiak, senior claims examiner.
USAA argues on appeal that the jury’s verdict on Hobbs’s breach-of-contract claim is contrary to the great weight of the evidence and that there is no sufficient evidentiary basis from which the jury could find in favor of Hobbs, because, it says, it presented uncontradicted evidence of fraud by Hobbs that would void the insurance policy. It is well settled that “ ‘a [preverdict motion for a JML] must be made at the close of all the evidence and that a timely [postverdict motion for a JML] must be subsequently made before an appellate court may consider on appeal the insufficiency-of-evidence issue directed to the jury’s verdict.’ ” Sears, Roebuck & Co. v. Harris, 630 So.2d 1018, 1025 (Ala.1993) (emphasis added) (quoting Bains v. Jameson, 507 So.2d 504, 505 (Ala.1987)). Our supreme court has stated:
“We find the procedures contained in Rule 50 [Ala. R. Civ. P.] devise a precise plan for attacking the sufficiency of the evidence. This plan recognizes the important role played by the trial judge in determining that sufficiency. The final step in preserving appellate review of the sufficiency of the evidence in a jury trial is the making of a timely [postver-dict motion for a JML]. Failure to make that motion prohibits appellate review of the sufficiency of the evidence. This is one reason a [preverdict motion for a JML] must be made at the close of all the evidence. Failure to make the latter *972 motion at the close of all the evidence precludes the party complaining of the insufficiency of the evidence from later making a [postverdict motion for a JML]. See Rule 50 [Ala. R. Civ. PJ This preclusion, thus, prevents the appellate court from reviewing the sufficiency of the evidence in a jury trial.”
Great Atl. & Pac. Tea Co. v. Sealy, 374 So.2d 877, 881 (Ala.1979) (emphasis added).
As previously mentioned, USAA failed to make a preverdict motion for a JML at the close of all the evidence. We note the following colloquy between the trial court and counsel for USAA:
“[The court]: Motions after the close of all the evidence?
“[USAA counsel]: Your Honor, at this point, we have a motion for a directed verdict as to the ... bad faith count in the complaint. The grounds, your Hon- or, are those grounds that we stated previously at the close of the plaintiffs evidence plus that additional evidence that the jury has now heard on the difficulty that USAA had with the descriptions given by Sgt. Hobbs of the items and therefore the difficulty determining what the value of those items might be based on the descriptions. I won’t argue the remaining facts, Judge. I think those all were presented at the close of the plaintiffs evidence. So with that, we’ll close the argument.
“[The court]: Do you wish to make any motion with regard to the contract?
“[USAA counsel]: No, sir. I think there’s a jury question on the contract.”
Accordingly, because USAA failed to renew its motion for a JML as to the breach-of-contract count at the close of all the evidence, we are now precluded from considering USAA’s argument as to the sufficiency of the evidence regarding that count.[4]
USAA next argues that the jury’s award of $65,000 in compensatory damages is not supported by the evidence. This argument is without merit. We note the following:
“Jury verdicts are presumed to be correct. This presumption of correctness is further strengthened by the trial court’s denial of a motion for new trial. The appellate court must consider those tendencies of the evidence most favorable to the prevailing party and must indulge such inferences as the jury was free to draw. Therefore, a judgment based on a jury verdict will not be reversed unless it is plainly and palpably wrong.”
Alabama Agric. & Mech. Univ. v. King, 643 So.2d 1366, 1370 (Ala.Civ.App.1994) (citations omitted). A plaintiff is not required to prove his damages to a mathematical certainty; rather, he is required to present evidence tending to show the extent of damages as a matter of just and reasonable inference. Jamison, Money, Farmer, & Co. v. Standeffer, 678 So.2d 1061 (Ala.1996).
USAA specifically argues that the amount of compensatory damages that could have been awarded was $68,094 — the amount claimed in the sworn proof of loss — or for a lesser amount that would be supported by the evidence if the jury be *973 lieved that the value of the items was less than the amount claimed by the plaintiff. This is exactly what the jury did in awarding Hobbs $65,000 in compensatory damages.[5] The jury obviously concluded from the evidence presented that Hobbs owned the missing items, but that the value of the items was slightly less than the value claimed by Hobbs. The evidence before the jury was sufficient to support a compensatory-damage award of $65,000.
USAA next argues that the trial court erred in failing to grant its prever-dict JML on Hobbs’s bad-faith claim. The standard of review for a motion for a JML, under the current version of Rule 50, Ala. R. Civ. P., is the same as the standard for review of a motion for a directed verdict and a motion for a JNOV under Rule 50 as it read before the October 1, 1995, amendment. See Montgomery Coca-Cola Bottling Co., Ltd. v. Golson, 725 So.2d 996 (Ala.Civ.App.1998).
Our supreme court has stated:
“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11,1987, the nonmovant must present ‘substantial evidence’ in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31 (Ala.1999).
We note the following discussion by Justice Lyons of the tort of bad faith in Employees’ Benefit Ass’n v. Grissett, 732 So.2d 968 (Ala.1998):
“In Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981), this Court ... recognized a new tort action for the bad-faith failure to pay an insurance claim. Liability was grounded on either (1) the defendant’s failure to pay the claim, with no lawful basis for the refusal, coupled with the defendant’s knowledge of the fact that it had no lawful basis or (2) the defendant’s intentional failure to determine whether there was any lawful basis for such refusal. 405 So.2d at 7. In National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala.1982), the Court modified those standards and recognized the ‘normal’ versus the ‘abnormal’ bad-faith case. In ‘normal’ cases, the plaintiffs contract claim had to be so strong that the plaintiff would be entitled to a preverdict JML; if a fact issue made a JML inappropriate, then the defendant was enti- *974 tied to a JML on the plaintiffs bad-faith claim. 419 So.2d at 1362. Even so, a trial court’s failure to enter a JML on the plaintiffs breach-of-contract claim is not fatal as long as the trial court correctly determines that the plaintiff has met the standard of proof required for a JML. Loyal American Life Ins. Co. v. Mattiace, 679 So.2d 229, 235 n. 2 (Ala.), cert. denied, 519 U.S. 949, 117 S.Ct. 361, 136 L.Ed.2d 252 (1996).
“The rule in ‘abnormal’ cases dispensed with the predicate of a prever-dict JML for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation. Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So.2d 661 (Ala.1995); Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990). A defendant’s knowledge or reckless disregard of the fact that it had no legitimate or reasonable basis for denying a claim may be inferred and imputed to an insurer when it has shown a reckless indifference to facts or proof submitted by the insured. Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 924 (Ala.1981).
“So, a plaintiff has two methods by which to establish a bad-faith refusal to pay an insurance claim: he or she can prove the requirements necessary to establish a ‘normal’ case, or, faffing that, can prove that the insurer’s failure to investigate at the time of the claim presentation procedure was intentionally or recklessly omissive.”
Grissett, 732 So.2d at 975-76 (footnote omitted). For a more thorough discussion of the development in the law of the tort of bad faith see the discussion in State Farm Fire & Casualty Co. v. Slade, 747 So.2d 293 (Ala.1999).
Our supreme court set forth the elements necessary for a plaintiff to establish a bad-faith claim in National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982); those elements are:
“(a) an insurance contract between the parties and a breach thereof by the defendant;
“(b) an intentional refusal to pay the insured’s claim;
“(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
“(d) the insurer’s actual knowledge of the absence of any legitimate or arguable reason;
“(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer’s intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.”
Id., at 183. “Requirements (a) through (d) represent the ‘normal’ case. Requirement (e) represents the ‘abnormal’ case.” Grissett, 732 So.2d at 976. In a “normal” case the insurer is precluded from using an ambiguity in the contract as a basis for claiming a debatable reason not to pay a claim. Id. To recover under a theory of an “abnormal” case,, the plaintiff must show “(1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured’s claim.” Slade, 747 So.2d at 318.
Beth Hockman, a claims adjuster with USAA, took a recorded statement from Hobbs on December 23, 1998. Hockman testified that she asked Hobbs to provide a description of the property, where the *975 property was purchased, photographs, receipts, warranty booklets, appraisals, and any other documents that would establish the value and proof of purchase of the alleged missing items. She stated that Hobbs informed her he would provide that information. Hockman .received from Hobbs a packet of materials and a memorandum dated December 28, 1998. The memo gave a brief description of the items and the city or country in which they were purchased. This memorandum did not provide an actual name of the seller or vendor. Hockman stated that she forwarded the information to Tonia Mazac, a buyer with USAA’s claims replacement service, to establish the value and authenticity of the item. Hockman also stated that she spoke with David Hozinec, a member of USAA’s special investigations unit, in order to get some ideas on how to establish the values and authenticity of the alleged missing items. Hockman received a second memorandum from Hobbs dated January 9, 1999. Hobbs stated in that memorandum that he had provided USAA with all of the receipts he had in his possession, that some of the receipts and authenticating documents had been packaged with the missing items, and that he had also provided verification of the weight discrepancy of the shipment in order to substantiate his loss. Hobbs also gave a further detailed description of the alleged missing items and stated that he referred to magazines, catalogues, and antique collectors’ guides in making his evaluations. Hockman stated that after she forwarded the memos and materials to Mazac she followed up with the shipping and storage companies that had handled Hobbs’s shipment.
Mazac testified that the claims replacement service consists of 15 buyers who have specialized knowledge in a variety of products. The primary responsibility of the claims replacement service is to provide values or replacement costs to claims adjusters on property as to which a USAA member has sustained a loss. Mazac testified that in valuing antiques, she would obtain a description of the antique and then refer to such resources as antique-value guides, dealers, and experts. Mazac testified that she reviewed the memos and materials provided by Hobbs in order to determine the value of the alleged missing items. Following her review of the memos and materials, Mazac notified Hockman by letter dated February 15, 1999, that the descriptions provided by Hobbs were vague and did not contain enough information to verify the values Hobbs claimed to have paid for the items. Mazac provided a summary of the additional information needed to properly evaluate Hobbs’s claim. Hockman testified that after she received the letter from Mazac, she concluded that there were some inconsistencies associated with the claim and that the claim was beyond the scope of her experience so she referred the claim to Hozinec.
Richard Swann, an investigator with USAA’s special investigations unit, began investigating Hobbs’s claim in February 1999. Swann assigned Allen Haskins, an investigator, to interview Hobbs in order to obtain additional information regarding the claim and the alleged missing items. Haskins took a recorded statement from Hobbs on March 4, 1999. Swann testified that after reviewing the information obtained by Haskins and discussing that information with the claims staff, he had a conversation with Hobbs in which he requested additional documentation from Hobbs. Swann stated that Hobbs told him he would provide financial records that would substantiate the large cash purchases of the items. Swann testified that at that point USAA had questions regarding the quantity of items alleged to have been purchased in a short period and *976 whether Hobbs had the financial resources to make those purchases. Swann obtained an authorization from Hobbs to obtain financial and credit information.
Hobbs agreed to submit to an examination under oath, which was conducted by-Swann, Hozinec, and USAA’s counsel on September 23, 1999. Swann testified that, after the examination under oath, USAA had further questions and concerns relating to Hobbs’s claim. Swann stated that Hobbs failed to produce a receipt for any of the alleged missing items and failed to produce the name of the seller or vendor from which the items were purchased. He stated that Hobbs had not sufficiently established proof of purchase or ownership of the items at that time. Swann testified that following the examination under oath he directed additional investigators to interview Myong, Hobbs’s former wife, to obtain any additional information possible from the moving companies involved, and to obtain any documentation from Hobbs’s home state of Georgia regarding any possible inheritance.[6]
Swann testified that he attended a conference with various other USAA representatives, including a regional assistant vice president of claims, legal advisors, and a management-level underwriter, to discuss the status of Hobbs’s claim. Swann stated that the decision was made at that conference to deny Hobbs’s claim. He testified that USAA was concerned because Hobbs had failed to list the alleged missing items on the high-risk inventory and that Hobbs had been unable to provide the name of a dealer or vendor from which he had purchased the items, or otherwise properly to substantiate his loss. Swann further testified that USAA was concerned with Hobbs’s financial condition because he alleged to have purchased many expensive items within a short period, yet 15 checks he had written in December 1997 were returned for insufficient funds, and he had negative balances in a bank account in December 1997 and January 1998. Swann also stated that Hobbs had provided inconsistent statements regarding his annual income. Swann testified that USAA conducted a thorough investigation of Hobbs’s claim and that many times it found contradictory or inconsistent statements by Hobbs, which led to an “air of uncertainty” regarding his claim.
Barbara Slawiak, a senior claims examiner and claim investigations advisor with USAA, testified that Hobbs’s claim was reviewed by the senior regional vice president for claims, the legal department, and her, at a regional claims conference, and that the decision to deny the claim was a collective decision made by those employees of USAA at the claims conference. Slawiak stated that USAA did not deny Hobbs’s claim based on one reason, but rather considered a number of reasons and looked at the “whole picture.”
Slawiak testified that Hobbs had failed to substantiate his alleged loss. She stated that Hobbs failed to produce a single receipt for any of the alleged missing items and that the documentation he did produce did not pertain to the missing items; that Hobbs was unable to produce the name of any dealers or vendors from which he purchased the items; that he was unable to produce appraisals for the rather expensive missing items; and that the items could not be verified by Mazac based on the descriptions and materials provided by Hobbs.
*977 Slawiak testified that it was significant to USAA in denying the claim that none of the alleged missing items were listed on the high-risk inventory addendum. She stated that the claim presented by Hobbs indicated that 13 items were missing and that he had enough space available on the front of the high-risk inventory addendum to list all but two of the items. Slawiak stated that USAA had never been provided with a copy of the reverse side of the loss-prevention worksheet — the document upon which Hobbs claims to have listed the missing items. Slawiak further stated that it was significant to USAA that the high-risk inventory addendum indicated that all high-risk items were received and did not list any of the items as missing when it was signed by the Coleman employee at the time of delivery.
Slawiak testified that USAA took Hobbs’s financial condition into consideration before denying his claim. She stated that Hobbs gave inconsistent statements regarding his income and the amount of insurance proceeds he had received as a result of the deaths of his father and brothers. Slawiak testified that it was significant to USAA that Hobbs had “bounced” 15 checks in December 1997, the month preceding January and February 1998, which were the months he allegedly purchased the items. She also stated that it was significant to USAA that Hobbs had negative balances in a bank account in December 1997 and January 1998. Slaw-iak testified that it was significant to USAA that Hobbs’s banking records do not indicate large cash transactions in January 1998. For instance, she stated that Hobbs alleged to have purchased $18,000 worth of china in January 1998; however, his banking records do not indicate an $18,000 transaction in January 1998.
Hobbs testified that while he was stationed in Germany his annual salary with the Army was $66,000. He stated that he earned an additional $17,000 per year performing automobile body repair work and $1,500 per month delivering papers for “Stars & Stripes.” He stated that his wife earned approximately $4,000 per month as a civilian employee for the government. The record indicates that Hobbs received $19,583.99 in insurance proceeds as the result of his father’s death, plus an additional gift of $7,200 from his father for a total of $26,783.99. Hobbs received an additional $12,500 in life insurance proceeds from the death of his two brothers. Hobbs also testified that he received a $14,000 loan from his wife.
Hobbs testified that USAA requested documentation in order to support his claim. Hobbs stated that he had no original documents for the missing items. He stated that the original receipts of the missing items and the certificates of authenticity were packed with the items. Hobbs testified that he used books and magazines in an attempt to identify and describe for USAA the items that were missing. Hobbs stated that he attempted to obtain a copy of the reverse side of the loss-prevention worksheet — the side he claims to have listed the items on — but was unable to do so because the moving company had declared bankruptcy and was no longer in business. Hobbs testified that he spent approximately $2,400 in an attempt to acquire documentation to substantiate his claim.
The parties presented conflicting evidence from which a jury could reasonably determine that Hobbs had indeed purchased the items in question, the value of those items, and that he had sufficiently substantiated his loss of those items, and, therefore, that USAA had breached its contract of insurance with Hobbs by failing to pay his claim. However, because the parties presented conflicting evidence from *978 which conflicting inferences could be drawn, Hobbs was not entitled to a pre-verdict JML on his breach-of-contract claim. The evidence also indicates that USAA had at least a debatable reason for denying Hobbs’s claim. Accordingly, because Hobbs was not entitled to a pre-verdict JML on his breach-of-contract claim and because a debatable reason existed for denying his claim, USAA was entitled to a pre-verdict JML on the bad-faith claim under the “normal” case scenario.
The record indicates that USAA conducted a thorough and extensive investigation of Hobbs’s claim. USAA took several in-depth statements from Hobbs, including an evaluation under oath. USAA interviewed other witnesses and followed up with the shipping company involved. Ma-zac researched the items based on the descriptions provided by Hobbs in an attempt to substantiate Hobbs’s claim. USAA made repeated requests to Hobbs to provide the name and identity of any dealer or vendor from whom he had purchased the items, as well as to provide any original receipts to substantiate the claim. Finally, the evidence indicates that the decision to deny Hobbs’s claim was a collective one made after the claim was evaluated by the legal department and several management-level employees of USAA. We conclude that Hobbs failed to establish that USAA failed to properly investigate his claim or submit it to a cognitive evaluation before denying it. Accordingly, USAA was entitled to a pre-verdict JML on the bad-faith claim under the “abnormal” case scenario.
Because we have concluded that the trial court erred in submitting Hobbs’s bad-faith claim to the jury, we necessarily conclude that the trial court erred in submitting Hobbs’s punitive-damages claim to the jury-
We affirm the judgment as to the breach-of-contract claim and the award of compensatory damages and reverse the judgment as to the bad-faith claim and the award of punitive damages. The case is remanded for the trial court to enter an order consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN, J., concurs.
CRAWLEY, THOMPSON, and MURDOCK, JJ., concur in the result.

. Hobbs withdrew the count alleging the tort of outrage.

. Hobbs and Myong were subsequently divorced.

. Coleman America Moving Services is also referred to in the record as "Covan America.”

. Assuming the issue had been properly preserved, the record would support affirming the jury's verdict on the breach-of-contract claim. The misrepresentations alleged by USAA to have been made by Hobbs were not related to any items for which a claim was made under the USAA policy. Therefore, there was no misrepresentation of a "material fact or circumstance [nor] ... false statements or ... fraudulent conduct relating to this insurance.”

. It should be noted that Hobbs has not cross-appealed to challenge the adequacy of the damages award of $65,000 rather than the claimed loss of $68,094.

. Hobbs received money as the beneficiary on life insurance policies of his father and brothers.