Thomas R. Burnett owns a family farm in rural St. Clair County. In 1990, Burnett entered into a "Finishing Hog Agreement" with Arkansas-California Livestock Company, Inc., a predecessor of Tyson Foods, Inc. ("Tyson"). The contract stated that Burnett was an independent contractor of Tyson, and it provided that he would be responsible for operating and maintaining a hog farm. Tyson would deliver *Page 806 
young hogs to Burnett, and he would feed, water, and care for the hogs until they reached market size, at which time Tyson would retrieve the hogs.[1]
Pursuant to the contract, Tyson supplied all food, veterinary supplies, and veterinary care for the hogs. Because when they entered the contract Burnett did not yet have hog houses on his property, Tyson determined the location where the houses were to be built, specified the dimensions of the houses, and assisted Burnett in securing financing for construction of the houses.
Tyson also required Burnett to construct and maintain a waste-management system in compliance with a design developed by the U.S. Department of Agriculture's Soil Conservation Service. The design provided for waste from the hog houses to be drained into a pipe and then collected in two lagoons. At various times, the waste would be spread onto Burnett's fields for disposal.
Once Burnett's construction of the houses and the waste-management system was complete, Tyson delivered hogs to the farm. At any given time, approximately 4,800 hogs were housed on the Burnett farm.[2]
Tyson representatives would conduct inspections of the Burnett farm about once a week and note their observations on standardized inspection reports and with handwritten notes.
Ray Stevens and his wife, Barbara Stevens, owned property adjacent to Burnett's. Shortly after the hog farm became operational, the Stevenses began to smell a noxious odor emanating from the Burnett farm and saw waste from the farm flow onto their property and into a creek located on their property. In 1991, the Stevenses, along with several other neighbors, filed an action in the Circuit Court of St. Clair County against Burnett and Tyson. However, they dismissed the action, without prejudice, in 1994, after the smells had been significantly reduced.
The Stevenses refiled their action in 1998. Their complaint included claims alleging nuisance, negligence, and trespass. The case came to trial in June 1999. At trial, Burnett admitted that there had been recurring odor problems at the time the 1991 lawsuit was filed. He also admitted that the waste-management system installed would regularly stop up and that the obstruction would cause constant leaks, spills, and overflows of the waste.[3] The Stevenses introduced copies of various written inspection reports and photographs taken by Tyson representatives that confirmed the waste-overflow problems. The Stevenses also presented evidence that indicated Tyson knew about the odor problems and had explained to Burnett how he could correct the problems. Although Burnett testified that he could not afford to make the necessary repairs all at once, he also admitted building a vacation home in 1994, as well as constructing a new principal residence on his St. Clair County farm in 1998.
Following the introduction of all the evidence, Tyson and Burnett requested a jury instruction on the defense of contributory negligence. Tyson and Burnett alleged that the Stevenses had contributed to the smell on their property because they also had livestock on their 250-acre farm. The *Page 807 
livestock owned by the Stevenses included 70 head of cattle, 3 horses, 4 dogs, and 4 guineas. Burnett also presented evidence indicating that the Stevenses ran an automobile-salvage business and stored 100 to 150 vehicles on their property. Although Tyson and Burnett argued that this evidence supported their request for an instruction on contributory negligence, the court denied the requested instruction, stating:
 "The negligence you [Tyson/Burnett] are claiming to is a devaluation of the property prior to the incident complained of which is the nuisance or trespass, and that is not contributory negligence. It has to be that proximately causes or contributes to the injury complained of on that occasion. That is why I didn't give it. I did give diminution in damages, which I think is very appropriate."
The jury returned a verdict awarding the Stevenses $2,500 in compensatory damages and $75,000 in punitive damages. The court entered a judgment on the verdict on June 29, 1999. Thereafter, Burnett filed a motion under Rules 50 and 59, Ala.R.Civ.P. Tyson joined Burnett's motion, seeking, alternatively, a judgment as a matter of law, a remittitur, or a new trial. Following a hearing conducted pursuant toHammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), the court entered a detailed order denying the motions and enumerating its findings regarding the factors set out in Hammond, Green Oil Co. v. Hornsby,539 So.2d 218 (Ala. 1989), and BMW of North America, Inc. v. Gore,517 U.S. 559 (1996).
Tyson and Burnett appeal, arguing that the trial court's refusal to instruct the jury on contributory negligence was reversible error. Separately, Tyson also argues that the court improperly sustained the jury's finding that Burnett was an "agent" of Tyson in connection with his operation of the hog farm. Finally, both Tyson and Burnett contend that the trial court erred by entering a judgment on the jury's punitive-damages award.
 Analysis
Because this appeal arises from a judgment based on a jury verdict, we "must consider the evidence in a light most favorable to the prevailing party [the Stevenses] and must set aside the verdict only if it is shown to be plainly and palpably wrong." Cobb v. MacMillan Bloedel, Inc.,604 So.2d 344, 345 (Ala. 1992) (citation omitted). A jury's verdict is presumed to be correct, and that presumption of correctness is strengthened by the trial court's denial of a motion for a new trial.Transport Acceptance Corp. v. Vincent, 521 So.2d 976 (Ala. 1988).
Under Alabama law, "`[a] party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis for the granting of a new trial.'" King v. W.A. Brown Sons, Inc., 585 So.2d 10, 12 (Ala. 1991) (citation omitted). When an objection to a jury charge has been properly preserved for review on appeal, as this one was, we look to the entirety of the jury charge to see if there was reversible error, and reversal is warranted only if the error is prejudicial. King, 585 So.2d at 12.
The trial court first charged the jury that it must decide whether Burnett was an agent of Tyson. The trial court further charged the jury on the Stevenses' claims of nuisance, trespass, wantonness, and negligence. The trial court defined "nuisance" for the jury, incorporating into the charge the statutory definition of that term. The trial court charged that a nuisance could result from intentional conduct, unintentional conduct, or negligence, but stated that for the jury to determine a *Page 808 
nuisance had stemmed from negligence, it must find a duty, a breach of that duty, causation, and damage before it could find for the Stevenses. With regard to the damages recoverable, the trial court specifically charged:
 "Compensatory damages for a nuisance is the difference in the reasonable market value of the property of the plaintiffs with the nuisance, and the value of what the property would have been had the nuisance not existed."
Additionally, the trial court charged that the Stevenses were alleging negligence against Tyson and Burnett. The trial court defined "negligence" as a failure to exercise care and instructed the jury that it must find that the breach of duty, not an intervening, new, or independent act, proximately caused the Stevenses' injury. With regard to the damages recoverable for negligent acts of Tyson and Burnett, the trial court charged:
 "Tyson claims that some of the damages that are claimed by the plaintiffs in this case were some of the damages to the property — the diminution in market value, was caused by actions of the plaintiffs alone. It is for you ladies and gentlemen of the jury to determine what amount of damages were proximately caused by the actions of the defendants and what amount of damages may have been caused by the plaintiffs' own actions on their own property. You must find, in order to award damages against the defendants for any of these actions, you must find that the defendants' actions proximately caused those damages."
The Stevenses' claims alleging nuisance and negligence were founded upon the smells coming from Burnett's property, as well as upon the waste that flowed onto the Stevenses' property. Although Tyson and Burnett argue that the Stevenses' livestock could have contributed to the nuisance complained of, in view of the facts presented that seems unlikely. Burnett's farm housed 4,800 hogs at any given time, whereas the Stevenses' livestock totaled only 70 head of cattle, 3 horses, 4 dogs, and 4 guineas on their 250-acre farm. The trial court correctly charged that any damages the jury awarded for negligence must be based on damage caused by Tyson and/or Burnett, not by some intervening or independent act. Once charged in this manner, the jury was free to consider all the evidence presented, and, thus charged, it found liability on the part of Tyson and Burnett. In considering the jury charge in its entirety, we find no reversible error.
Tyson also argues that the trial court erred in accepting the jury's finding of an agency relationship between Tyson and Burnett.[4]
Typically, the existence of an agency relationship is a question of fact for a jury to decide. Carlton v. Alabama Dairy Queen, Inc., 529 So.2d 921,923 (Ala. 1988). "Whether a relationship is an independent contractor relationship or is a master-servant relationship depends on whether the entity for whom the work is performed has reserved the right to control the means by which the work is done." Keebler v. Glenwood Woodyard,Inc., 628 So.2d 566, 568 (Ala. 1993). Although Tyson points out that its contract with Burnett specifically stated that Burnett was an independent contractor, whether an agency exists is determined from the facts, not by how the parties choose to characterize their relationship. See Curry v.Welborn Transport, 678 So.2d 158, 161 (Ala.Civ.App. 1996). *Page 809 
The Stevenses presented evidence indicating that Tyson specified where the hog houses should be located and how large each house should be, and that Tyson even arranged for financing of the houses. Tyson required that Burnett implement a specific waste-management system. It inspected Burnett's hog operation almost every week and, as evidenced by the inspection reports and photographs, recommended solutions for Burnett's waste-management problems. Tyson provided the hogs and provided food, veterinary supplies, and veterinary care for the hogs. Burnett's primary responsibility was to feed, water, and otherwise care for the animals. The evidence presented was sufficient to create a jury question as to the existence of an agency. Therefore, the trial court did not err in sustaining the jury's verdict as to this issue.
Finally, Tyson and Burnett argue that the trial court erred in upholding the jury's punitive-damages award. When considering a defendant's argument that a punitive-damages award is excessive, we consider the "guideposts" established by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), and the factors set forth in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989). SeeEmployees' Benefit Ass'n v. Grissett, 732 So.2d 968, 978 (Ala. 1998).
The Gore guideposts for determining whether a punitive-damages award is excessive are: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio between the punitive-damages award and the actual harm to the plaintiff; and (3) the possible civil or criminal penalties that could be imposed for comparable misconduct. BMW of North America,Inc. v. Gore, 517 U.S. 559, 575, 580, 583 (1996).
The United States Supreme Court has stated that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore,517 U.S. at 575. Although the Gore opinion does not provide a particular measure for evaluating reprehensibility, it acknowledges that acts of affirmative misconduct are more reprehensible than mere negligence. SeeLife Ins. Co. of Georgia v. Parker, 729 So.2d 619, 621 (Ala. 1998).
The evidence presented to the jury included the various written inspection reports and handwritten memoranda of the Tyson representatives, as well as photographs; these items illustrated both the existence of the waste-management-system problems and the failure of either Tyson or Burnett to take action to correct the problems. Burnett admitted the recurrence of odors, admitted he knew of the waste-management-system problems, and admitted he knew how to fix them. Although Burnett denied having the financial capability to repair the waste-management system, the Stevenses rebutted this denial with evidence indicating that Burnett had the ability to construct two new houses, one in 1994 and the other in 1998. While we find Burnett's conduct over the years to be fairly reprehensible, in light of his claim of financial incapability, we do not find that his conduct rises to the level of being highly reprehensible.
A second factor in the Gore analysis is the ratio of compensatory damages to the punitive damages awarded. Gore, 517 U.S. at 580. While the guarantees of due process do not require that we apply a mathematical formula to determine whether a punitive-damages award is excessive, the ratio between compensatory and punitive damages must be reasonable.Employees' Benefit Ass'n v. *Page 810 Grissett, 732 So.2d 968, 979 (Ala. 1998). "This Court has found constitutionally acceptable ratios ranging from 1:1 in Ford Motor Co. v. Sperau, 708 So.2d 111 (Ala. 1997), to 121:1 inForemost Ins. Co. v. Parham, 693 So.2d 409 (Ala. 1997)." Grissett, 732 So.2d at 979. In this case, the punitive-damages award of $75,000 is 30 times the compensatory-damages award of $2,500. Considering the facts before us, we find the ratio of 30:1 to be unreasonable.
The factors to be considered in a Hammond/Green Oil analysis are: (1) the relationship of the punitive-damages award to the likely or actual harm, (2) the reprehensibility of the conduct, (3) any profit gained by the conduct, (4) the defendant's financial condition, (5) the cost of the litigation, (6) any criminal sanctions that may have been imposed as a result of the conduct complained of, and (7) other civil actions of a related nature. Life Ins. Co. of Georgia v. Parker, 726 So.2d 619 (Ala. 1998).
Alabama law requires that punitive damages bear a reasonable relationship to the harm that is likely to occur from the conduct alleged, as well as to the actual harm that has already occurred. GreenOil, 539 So.2d at 223. "`If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.'" Green Oil, 539 So.2d at 223 (citation omitted). The damages awarded in this case stem from the mismanagement of wastes on the Burnett hog farm. Although the Stevenses endured the odors that emanated from the farm, as well as the frequent overflow of waste across their land, the jury awarded only $2,500 in compensatory damages. Burnett repaired the problem in 1998 and has since ceased raising hogs altogether. Therefore, the likelihood of further harm is nonexistent.
The second factor in the Hammond/Green Oil analysis is the reprehensibility of Tyson and Burnett's conduct. Factors such as the duration of the conduct, the defendant's awareness of the hazards created or likely to be created by his conduct, any deliberate concealment of those hazards, and the frequency of the kind of conduct complained of, can be considered in determining the reprehensibility of a party's conduct. Green Oil, 539 So.2d at 223. The conditions created by Tyson and/or Burnett's conduct persisted for several years, and the evidence presented at trial established that both Tyson and Burnett knew about the waste problem, the solutions available, and the harm created by the continued disrepair of the waste-management system. Although this conduct was reprehensible, it was not so reprehensible as to support a punitive-damages award 30 times greater than the compensatory damages. Considering these facts together, in conjunction with the analysis provided in our discussion of the Gore factors, we find the punitive-damages award to be excessive.
The third and fourth factors to be reviewed are, respectively, the profit gained by Tyson or Burnett by their conduct, and the defendants' respective financial positions. Both the record and the briefs to this Court are devoid of any direct evidence on these two factors. Although the Stevenses contended that Burnett should have used the money he spent to build homes in 1994 and 1998 to make the repairs to the waste-management system instead, no evidence indicated what, if any, profit Tyson and/or Burnett gained by failing to correct the waste-management problems. Because no party presented adequate evidence at the trial of this case to allow for a full analysis of the thirdHammond/Green Oil factor, we are unable to find that Tyson or Burnett profited from the misconduct. Additionally, because *Page 811 
neither defendant alleges that the punitive damages were excessive based on the defendants' relative financial positions, an analysis of the fourth factor is unwarranted.
We should also consider whether the punitive-damages award sufficiently rewarded the plaintiffs' counsel for assuming the risk of bringing this lawsuit and acted to encourage other plaintiffs to bring wrongdoers to trial. Green Oil, 539 So.2d at 223. The evidence before the trial court was that this case included the taking of several depositions and the exchange of documents and that the case ultimately resulted in a three-day trial in which several dozen exhibits were introduced. Furthermore, the evidence presented indicated that other people living near the Burnett farm incurred the same kind of injury the Stevenses suffered.
An additional factor we should consider is any criminal sanctions that have been imposed on either Tyson or Burnett as a result of the conduct complained of. No criminal sanctions based on this conduct have been imposed on Tyson or Burnett; therefore, we need not analyze this factor.
The last factor to be considered in our Hammond/Green Oil analysis is what other civil actions have been initiated based on the same or similar conduct. The Stevenses had filed a previous lawsuit against Tyson and Burnett in 1991, not long after the hog farm began operating. That litigation evidenced the existence of a problem and constituted notice to Tyson and Burnett of the claims and of the likelihood of recurrence if the problems were not fixed. In 1994, after the smells had decreased, the lawsuit was dismissed, without prejudice, only to be filed again in 1998. Although both Tyson and Burnett's acknowledgment of the waste-management problem is demonstrated in the actual filing and subsequent dismissal of the first action against them, the jury did not find the actual harm suffered by the Stevenses significant enough to require a large compensatory-damages award. Therefore, we conclude that the punitive damages awarded are excessive.
In considering both the Gore factors and the Hammond/Green Oil
factors, we find the punitive-damages award excessive. Therefore, we affirm the judgment, conditioned upon the Stevenses' accepting a reduction of the punitive-damages award to $25,000. If the Stevenses do not file with this Court an acceptance of this remittitur, within 21 days of the date this opinion is issued, the judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.
HOOPER, C.J., and MADDOX, SEE, LYONS, and ENGLAND, JJ., concur.
HOUSTON and JOHNSTONE, JJ., concur in part and dissent in part.
[1] Tyson retained ownership of the hogs at all times.
[2] The Burnett farm had a total of 8 hog houses, which were constructed in two clusters of 4 houses each. Each house contained approximately 600 hogs.
[3] Burnett testified that he began having problems with the stopping up and overflowing of the waste-management system as early as 1994.
[4] Burnett has not filed a separate brief on the agency issue, nor does he join in, or contest, the arguments presented by Tyson.