YATES, Presiding Judge.
On October 4, 2000, Julian Augustus Byrd sued the City of Evergreen (“the City”); the Evergreen Housing Authority (“the Housing Authority”); and police officer John Greene, individually, and in his capacity as an employee of the City and/or the Housing Authority, alleging assault, assault and battery, false imprisonment, malicious prosecution, negligent or wanton hiring and training, and conversion.
The Housing Authority moved to dismiss the complaint, arguing that, because it was a municipal corporation, it was immune from suit and, further, that the complaint failed to state a claim upon which relief could be granted. The City and Officer Greene also moved to dismiss the complaint, arguing that they were immune from suit based on the discretionary-function immunity afforded peace officers and appointing governmental units pursuant to § 6-5-338, Ala.Code 1975. The City also argued that it was immune from suit pursuant to § 11-47-190, Ala.Code 1975. The motions to dismiss filed by the defendants were denied by the trial court.
On January 11, 2002, the City and Officer Greene moved for a summary judgment, again arguing that they were immune from suit based on the same grounds previously asserted in their motion to dismiss. The City and Officer Greene also argued that they were entitled to a summary judgment on the merits of Byrd’s claims. On January 25, 2002, the Housing *1109 Authority moved for a summary judgment, arguing the same grounds as those set forth by the City and Officer Greene. The trial court, denied the defendants’ motions for a summary judgment.
Byrd entered into a pro tanto settlement with the Housing Authority for $10,000, and the parties entered into a joint stipulation of dismissal dismissing the Housing Authority from the action. The case proceeded to trial against the City and Officer Greene. At the close of Byrd’s case, he voluntarily dismissed his claims against the City. Additionally, at the close of Byrd’s case, Officer Greene moved for a preverdict judgment as a matter of law (“JML”), contending, as before, that he was entitled to discretionary-function immunity pursuant to § 6-5-338, Ala.Code 1975, as to Byrd’s claims against him. The trial court denied Greene’s motion. Greene renewed his motion for a prever-dict JML at the close of all of the evidence, based upon the same grounds as in his previous preverdict JML. The trial court denied that motion.
The case was submitted to the jury, and the jury returned a general verdict in favor of Byrd on his claims against Greene. The jury awarded Byrd $2,468 in compensatory damages and $30,000 in punitive damages. The trial court reduced the jury award by the amount of the pro tanto settlement and, on July 10, 2002, entered a verdict in favor of Byrd for $22,468. On July 11, 2002, Greene moved the court for a postverdict JML, or, in the alternative, for a new trial or a remittitur. Greene’s postjudgment motion was denied by operation of law; Greene appeals.
Greene argues on appeal that the trial court erred in failing to grant his motion for a summary judgment and his motions for a JML, because, he says, he was entitled to the discretionary-function immunity provided by § 6-5-338, Ala.Code 1975. The standard of review-for a motion for a JML is well settled. Our supreme court has stated:
“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case, or the issue to be submitted to, the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present ‘substantial evidence’ in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as 'the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the. trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Delchamps, Inc. v. Bryant, 738 So.2d 824, 830 (Ala.1999). The standard of review applicable to a JML is indistinguishable from the standard used by this court in reviewing a summary judgment. See Wal-Mart Stores, Inc. v. Smitherman, 872 So.2d 833 (Ala.2003).
*1110 The incident giving rise to this action occurred on November 19, 1998. At the time of the incident, Byrd was 25 years old, lived with his parents, and was attending Alabama Southern Community College and Faulkner University simultaneously. Officer Greene was employed as a police officer with the City. When he was not on duty with the City, Greene also served in a special capacity as a security officer at an apartment complex owned by the Housing Authority. Officer Greene received a rent-free apartment and free telephone service from the Housing Authority in exchange for his serving as the security officer at the Housing Authority apartment complex. Officer Greene testified that he was placed at the Housing Authority apartment complex as a “police officer on-site” as part of a federal drug program. His contract with the Housing Authority provided that his duties were to take calls; to submit reports; to walk the property daily, reporting any unusual activity; and to sticker and tow any inoperable vehicles. Officer Greene stated that he had had a meeting with the tenants and that the tenants complained of drugs, criminal activity, and loud music in the apartment complex. He stated that he was assigned to the Housing Authority apartment complex in order to “clean up the neighborhood.” Officer Greene and Byrd did not know each other before the night of the incident giving rise to this action, and they had had no previous dealings.
On November 19, 1998, Officer Greene was not on duty with the City police department, but was working in his capacity as the Housing Authority security officer. Although he was not on duty with the City, Officer Greene was patrolling the Housing Authority apartment complex in a City police car. Byrd entered the Housing Authority apartment complex at approximately 10:00 p.m. to visit Kim Bradley. Bradley was a friend of Byrd’s who lived in the Housing Authority apartment complex at 119 Frazier Circle and was unaware that Byrd was coming to visit her at that time. Byrd testified that he had visited Bradley unannounced on previous occasions. Byrd was driving his silver Nissan Sentra automobile as he entered the apartment complex. He stated that he had intended on going squirrel hunting earlier in the day and that he was dressed in orange camouflage clothing and had a .22 caliber rifle on the back seat of his vehicle.
Byrd testified that he was traveling approximately five to ten miles per hour as he entered the apartment complex. He stated that the stereo in his vehicle was on and that the windows in the vehicle were rolled up. Byrd testified that the volume level of his stereo was “normal, not loud at all” and that it was not audible from outside of the vehicle. He stated that it was not possible to hear the stereo from 15 feet or more away from the vehicle. Byrd stated that the speakers in the vehicle were “factory speakers” and that that “particular sound system didn’t go loud in the car.”
On his way to Bradley’s apartment, Byrd passed a parked police car, but he did not notice if the police car was occupied. Byrd testified that he did not notice any headlights or blue light behind him as he continued to Bradley’s apartment. Byrd stated that when he arrived at Bradley’s apartment, he parked, removed the detachable face of the stereo and placed it in the glove compartment of the vehicle, locked his vehicle, and began walking to Bradley’s apartment. Byrd describes what happened next as follows:
“Q. What happened?
“A. As I was standing there walking up to the door, I noticed someone walking behind me, and I turned around. And I seen this person standing there, *1111 and they asked me to, let me see your I.D.
“Q. All right. Did you later learn that person was John Greene, the defendant, who’s in court here today?
“A. Yes.
“Q. Is that — is he the person that walked up behind you?
“A. Yes.
“Q. How was he dressed?
“A. Dark pants. He had a quilted jacket on, plaid, red and black.
“Q. All right. Was there anything about his appearance, when you turned around and saw him, that indicated to you that he was a law-enforcement officer?
“A. No.
“Q. And did you speak to him, or did he speak to you first?
“A. Spoke to me first.
“Q. And what did he say?
“A. Let me see your I.D.
“Q. He didn’t identify himself as being a law-enforcement officer or working for the Housing Authority or anything?
“A. No.
“Q. And what did you say to him?
“A. Why? Why should I show you my I.D.?
“Q. And what did he say?
“A. He said, ‘Let me see your I.D.’ And I asked him, I said, ‘Why? I’m not doing anything. I’m just visiting a friend.’ And at that point, he pulled out his gun, and he pointed it at me. And I looked at him like, You’re going to shoot me now. And he put his gun away and said, ‘I heard your music.’ And I was like, You didn’t hear my music.’ And then he said, ‘I don’t know what’s wrong with you people in Evergreen.’ And I said, ‘You’re harassing me. I haven’t did anything. I’m just visiting a friend.’
“And he asked me to let [him] see the I.D. once again. And I told him, ‘Why? I’m not doing anything.’ And then he went to go on and say that he was going to get me banned from the complex. And I asked him, ‘How you going to get me banned from the complex? I can come over here whenever I want.’ And at that point, he told me that he worked for the federal government. And once he told me that, I was standing there, I just go in my pocket, and I give him my I.D. And at the point that I give him my I.D., he walks to his car, I follow him down to the car, when we get to the— well, actually, he got down before I did. When I get down, he spins me around, throws me against the car, and he starts to frisk me, and then he takes my right arm, and he pulls it back behind my back and he puts the cuff on my hand. Then he takes my left arm and pulls it up behind my back and puts the cuff on and he throws me in the car.
“And during this time, I’m asking him, ‘What are you doing?’ And he doesn’t say anything, he just throws me in the car. And once he puts me in the car, he gets in. And I’m asking, ‘What are you doing?’ And he didn’t say anything, and he proceeded to call in my driver’s license.”
Byrd testified that he noticed the City police car when Officer Greene approached him outside Bradley’s apartment, but he did not know that Officer Greene had emerged from the police car. Byrd denied that Officer Greene asked him to “come down off the Housing Authority property.” He further denied that he raised his voice or otherwise screamed or hollered during the conversation with Officer Greene. Byrd also denied waiving his arms or acting in a boisterous manner.
After Officer Greene placed Byrd in the police car, he radioed to have Byrd’s vehi- *1112 ele towed. Once the vehicle was towed, Officer Greene transported Byrd to the city jail. Byrd testified that he was retained at the city jail for approximately one and one-half hours and then transported to the county jail, where he was photographed and fingerprinted. Byrd was subsequently allowed to call his father to come pick him up. Byrd testified that from the time he was handcuffed until the time he was released he was detained approximately three hours. On the night of the incident, Officer Greene filed a complaint against Byrd for violating the City’s noise ordinance.[1] Byrd stated that he refused to sign the complaint because he had not violated the noise ordinance. Officer Greene wrote on the complaint “Jailed/Refused to Sign.” Thereafter, on November 21, 1998, Officer Greene filed additional complaints against Byrd for disorderly conduct and criminal trespass. Byrd was ultimately acquitted by the municipal court of all three charges.
Officer Greene’s account of the events giving rise to this action are in conflict with Byrd’s. Officer Greene testified that he was wearing a yellow traffic vest with the word “POLICE” written in black on the vest. He stated that he was sitting in the police car that was backed into a parking space. Officer Greene testified that he heard Byrd’s stereo playing before he actually saw Byrd’s vehicle. Officer Greene testified that after Byrd passed his vehicle he fell in behind Byrd’s vehicle and activated his blue light. Officer Greene stated that he temporarily lost sight of Byrd and that when he next saw Byrd’s vehicle it was parked in front of Bradley’s apartment. He stated that Byrd was “up on the embankment” approaching Bradley’s apartment. Officer Greene stated that Byrd was standing on the embankment when he first called to him. Officer Greene described the encounter as follows:
“Q.... How far were you from Julian Byrd when you first spoke with him?
“A. Standing at the adjunct where the first two driveways start. And there’s a step that goes up to that apartment, and he was on the embankment.
[[Image here]]
“Q.... And what did you first say to Julian Byrd?
“A. I asked him to come down so I could speak with him.
“Q. Is that exactly what you said?
“A. I don’t know exact words, sir, but I was asking him to come back to the vehicle, sir, so I could talk to him and let him know why I had, you know, approached him. I had my lights on.
“Q. All right. Did you hear Julian Byrd say that when you first spoke with him you were up there with him?
“A. I heard it, sir. Yes, sir.
“Q. You deny that?
“A. I sure do.
“Q. That’s a complete conflict in the testimony; is that right?
“A. It’s not true, sir.
“Q. But it is true that that’s a complete conflict in the testimony, isn’t it, Mr. Greene?
“A. Yes, sir.
“Q. So then when you told him to come back, I want to explain to you why I stopped you?
“A. Yes, sir.
“Q. Okay. What did he say, if anything?
*1113 “A. He was — he said something about for what, or he couldn’t figure why I was approaching him.
“Q. Well, did you tell him?
“A. I told him that I needed him to come back to the vehicle, could he come back off the property.
“Q. Well, when he asked you why, you didn’t tell him why?
“A. I was going to try to explain to him the fact about the noise, and that’s the reason I came behind him in the first place. But I couldn’t get no cooperation from him to come back off the embankment and come down there. He started to get loud.
“Q. You were having to talk loud to Mr. Byrd for him to hear you say come down here, I assume?
“A. No, sir.
“Q. Were you talking in a normal tone of voice?
“A. Just like if I say, Chief, can you come down here for a second? That’s basically what I said. It wasn’t that distance where I had to scream, no.
“Q. And then what happened, Mr. Greene?
“A. He totally refused and started getting loud and boisterous.
“Q. How was he getting loud?
“A. By telling me what he wasn’t going to do.
“Q. What did he say?
“A. Telling me that he didn’t have to answer me.
“Q. What did you tell him when he said, T don’t have to answer you?’
“A. I think at one point, when he wouldn’t come down, I went up on the embankment.
“Q. You say that you think you did?
“A. I went up on the embankment where he was.
“Q. Okay. How close did you get to him?
“A. Probably face-to-face.
“Q. Okay. Had you, sir, already pulled your gun and pointed it at Julian Byrd when you went up the hill? In other words, were you still down in your patrol car, in the area of your patrol car, when you pulled the gun and pointed it at Julian Byrd?
“A. I might have, because he wouldn’t take his hands out of his pockets.
[[Image here]]
“Q. And you pointed your gun, pulled your gun out and pointed it at him, and what did you say, sir?
[[Image here]]
“A. I needed to see his hands.
“Q. And what did he say then?
“A. He eventually took his hands out of his pockets.
“Q. How long?
“A. I don’t know how many minutes or seconds or whatever. Then I rehol-stered my weapon.
[[Image here]]
“Q. At the time you pulled your gun out and pointed it at Julian Byrd, while he had his hands in his pocket, you were far away as the lady on the end, according to your testimony. Did you say, T am a police officer, get your hands out of your pocket, sir?’
[[Image here]]
“A. I’m the overseer over here, the police officer over at the Housing Authority, that’s what I explained to him, that I needed him to come back off the property.
“Q. Okay. Then you walked up there?
“A. Yes, sir.
*1114 “Q. Was it at that time and on that occasion, after you had identified yourself, Mr. Greene, that he gave you his I.D.?
“A. No, sir.
“Q. When did he give you his I.D.?
“A. I got his I.D. out of his pocket after I had arrested him.
[[Image here]]
“Q.... Is it your testimony that you never had his I.D. until you handcuffed him and put him in the backseat?
“A. Yes, sir.
[[Image here]]
“Q. Did you handcuff him up near the door?
“A. When I went up, that’s when the verbal confrontation between him and I, that he got louder, and I saw the lights coming on. And he started yelling and talking very loud, and I gently tried to touch him by the shoulder and escort him off the property. He pushed my hand away. Upon pushing my hand away, I grabbed his arm. He pushed my hand away again. And then when I grabbed him, him and I started struggling, and I ended up reaching for my cuffs, grabbing him in the middle, and I think I cuffed one of his arms. In the meantime, struggling with him, I reached for my radio, and I called for help. And officers that was working at that time was at a fire, and they said they couldn’t come. And I said, well, 10-25 and struggled with him and managed to get his hand behind and cuff both.
[[Image here]]
“Q. Well, okay. So you got him handcuffed up there and then took him down the hill?
“A. I took him down and placed him inside my vehicle. I searched him first, and that’s when I got his driver’s license.”
After placing Byrd in the police car, Officer Greene went to Bradley’s apartment with Byrd’s driver’s license to inquire of Bradley if she knew Byrd. Officer Greene testified that Bradley stated that she knew Byrd but that she was not expecting him and that he was not coming to see her. Officer Greene stated that he then had Byrd’s vehicle towed and that he transported Byrd to City Hall.[2]
Officer Greene testified that the only reason he stopped Byrd was to cite him for a violation of the City’s noise ordinance. Officer Greene wrote Byrd a nontraffic citation for violation of the noise ordinance. Officer Greene also testified that he arrested Byrd for disorderly conduct and criminal trespass because “several times [Officer Greene had asked] him to come off the property, he remained up there unlawfully by creating a disturbance, and people’s lights were coming on.” Bradley testified that she saw Officer Greene outside her apartment on the night of the incident and that she witnessed the conversation between Officer Greene and Byrd. She stated that she did not hear Byrd cursing nor raising his voice in a loud and boisterous manner.
Section 6-5-838, Ala.Code 1975, provides peace officers with discretionary-function immunity, as follows:
“(a) Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Con *1115 stitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within ' the line and scope of his or her law enforcement duties.”
Our supreme court has recently adopted the concept of “arguable probable cause” in cases in which a police officer claims discretionary-function immunity after making a warrantless arrest. Borders v. City of Huntsville, 875 So.2d 1168 (Ala.2003). In Borders, a police officer arrested the plaintiff for disorderly conduct and for resisting arrest after a physical confrontation in a nightclub between the plaintiff and the police officer. The parties and witnesses to the confrontation gave differing accounts of what led to the confrontation and arrest. The plaintiff was subsequently acquitted of the charges against him in municipal court. He sued the City of Huntsville and the police officer who had arrested him, among others, alleging various theories of recovery stemming from the incident at the nightclub. The police officer raised discretionary-function immunity as a defense. The trial court entered a summary judgment in favor of the police officer. Borders, supra.
On appeal, our supreme court framed the issue to be decided as follows: “[Wjhether a peace officer making a war-rantless arrest on a charge based upon conduct the officer witnessed is entitled to discretionary-function immunity in a subsequent civil action after the arrestee is acquitted.” Borders, 875 So.2d at 1179. Our supreme court further stated:
“To come within the protection of § 6-5-338[, Ala.Code 1975], a municipal police officer must be engaged in a discretionary function with respect to the incident in question.... Discretionary-function immunity, as is the case with State-agent immunity, is withheld if an officer acts with willful or malicious intent or in bad faith. ...
“Generally, arrests and attempted arrests are classified as discretionary functions .... ‘Discretionary functions’ are broadly defined as ‘ “ ‘those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances.’ ” ’ Ex parte Duvall, 782 So.2d [244] at 248 [(Ala.2000)] (quoting [Ex parte] City of Montgomery, 758 So.2d [565] at 569 [(Ala.1999)], quoting in turn Wright v. Wynn, 682 So.2d 1, 2 (Ala.1996)).
[[Image here]]
“In Micalizzi v. Ciamarra, 206 F.Supp.2d 564, 576 (S.D.N.Y.2002), the district court, citing Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir.1997), and Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), recognized the concept of ‘arguable probable cause’ giving rise to qualified immunity when an officer makes an arrest lacking probable cause if officers of reasonable competence in the same circumstances and with the same knowl *1116 edge would disagree as to whether probable cause existed. ...
[[Image here]]
“Viewing the evidence in the light most favorable to [the nonmovant], as we are required to do in reviewing a summary judgment, we cannot determine, as a matter of law, that [the police officer] was engaged in a discretionary function when he arrested [the plaintiff], that is, that [the police officer] had arguable probable cause in that officers of reasonable competence in the same circumstances and with the same knowledge would disagree as to whether probable cause existed.
[[Image here]]
“In the present action, ... the facts are disputed as to the conduct of the arrestee and the officer. Such disputed facts preclude a determination as to whether [the officer] was engaged in a discretionary function and instead present a jury question.”
Borders, 875 So.2d at 1178-82 (footnotes omitted).
In the present case, Officer Greene charged Byrd with violating the City’s noise ordinance, criminal trespass, and disorderly conduct. Byrd was subsequently acquitted by the municipal court of all three charges. The evidence, as set out in detail above, indicates that Officer Greene’s and Byrd’s version of the events that occurred between them that led to Byrd’s arrest are in complete conflict. Based on our supreme court’s decision in Borders, because a jury question existed as to whether Officer Greene was engaged in a discretionary function or whether he had “arguable probable cause” to approach and arrest Byrd, the trial court did not err in denying Officer Greene’s motion for a summary judgment or his motions for a JML, and it properly presented the case to the jury. The jury obviously resolved the conflicts in the evidence in favor of Byrd. Accordingly, the trial court’s denial of Officer Greene’s motion for a summary judgment and his motions for a JML is affirmed.
Relying upon Montgomery v. City of Montgomery, 732 So.2d 305 (Ala.Civ. App.1999), Officer Greene next argues that all of Byrd’s claims “merge” into a malicious-prosecution claim and that malicious-prosecution claims are disfavored by the law. Officer Greene’s reliance upon Montgomery is misplaced. In Montgomery, the plaintiff sued the City of Montgomery and several of its law-enforcement officers, as well as others, alleging false arrest, false imprisonment, malicious prosecution, a violation of § 15-10-3, Ala.Code 1975,[3] negligence, recklessness, and wantonness. Unlike Byrd, the plaintiff in Montgomery was arrested pursuant to a valid warrant. This court held that because the plaintiff was arrested pursuant to a valid warrant, “his complaint, if it properly states a claim at all, states a claim of malicious prosecution.” Montgomery, 732 So.2d at 308. Accordingly, because Byrd was not arrested pursuant to a valid warrant, we find Montgomery to be distinguishable from this case and not applicable.
Officer Greene next argues that the trial court erred in not granting his motion for a remittitur, because, he says, the jury’s award of punitive damages was excessive in relation to its award of compensatory damages. We disagree. As stated above, the jury returned a general verdict in favor of Byrd, and it awarded compen *1117 satory damages in the amount of $2,468 and punitive damages in the amount of $30,000. The punitive-damages award was later reduced by the trial court in the amount of $10,000 — the amount of the pro tanto settlement entered into between Byrd and the Housing Authority — and the trial court entered a judgment in favor of Byrd for $22,468. The ratio of the punitive damages awarded in this case to the compensatory damages awarded is 8:1.
Our review of the trial court’s determination that the jury’s punitive-damages award was not excessive is de novo. Orkin Exterminating Co. v. Jeter, 832 So.2d 25 (Ala.2001); Acceptance Ins. Co. v. Brown, 832 So.2d 1 (Ala.2001). In reviewing a punitive-damages award, this court must consider the “guideposts” established by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (“Gore I”), as well as the factors set forth in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). See Tyson Foods, Inc. v. Stevens, 783 So.2d 804 (Ala.2000); BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) (on remand from the United States Supreme Court). The Gore I “guideposts” include: (1) the degree of the reprehensibility of the defendant’s conduct; (2) the ratio between the punitive-damages award and the actual harm to the plaintiff; and (3) the possible civil or criminal sanctions for comparable misconduct. Tyson Foods, supra. The Hammond and Green Oil factors include:
“(1) the relationship of the punitive-damages award to the likely or actual harm, (2) the reprehensibility of the conduct, (3) any profit gained by the conduct, (4) the defendant’s financial condition, (5) the cost of the litigation, (6) any criminal sanctions that may have been imposed as a result of the conduct complained of, and (7) other civil actions of a related nature.”
Tyson Foods, 783 So.2d at 810. Our supreme court has found constitutionally acceptable ratios of punitive damages to compensatory damages ranging from 1:1 to 121:1. Employees’ Benefit Ass’n v. Grissett, 732 So.2d 968 (Ala.1998). Further, “[p]erhaps the most important indici-um of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.” Gore I, 517 U.S. at 575, 116 S.Ct. 1589.
After reviewing the punitive-damages award in this case, in light of the above-mentioned “guideposts” and factors, we conclude that the punitive-damages award is not excessive. The judgment of the trial court is due to be affirmed.
AFFIRMED.
CRAWLEY, J., concurs in part and concurs in the result in part.
THOMPSON, J., concurs in the result.
PITTMAN and MURDOCK, JJ„ dissent.

. It is a violation of the City's noise ordinance for a stereo to be audible from over 15 feet away.

. Presumably, the City's jail was located at City Hall.

. This statute requires that an arresting officer have a warrant for the person to be arrested unless the person to be arrested is alleged to have committed a felony or a misdemeanor in the officer’s presence.